The STATE of Ohio, Appellee,

v.

WEBER, Appellant.

[Cite as *State v. Weber* (1997), 124 Ohio App.3d 451.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APA03–323.

Decided Dec. 23, 1997.

452

*Ronald J. O'Brien*, Franklin County Prosecuting Attorney, and *Susan E. Day*, Assistant Prosecuting Attorney, for appellee.

*Andrew P. Avellano*, for appellant.

DESHLER, Justice.

This is an appeal by defendant, Julius F. Weber, from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which defendant was found guilty of aggravated arson, aggravated burglary, burglary, and breaking and entering.

This case arose out of a suspected arson fire which destroyed a home at 5362 Swisher Road, Groveport, Ohio, on February 5, 1996. The defendant and his brother, Louis E. Weber, were both indicted on February 29, 1996, on charges of aggravated arson, in violation of R.C. 2909.02, aggravated burglary, in violation of R.C. 2911.11, burglary, in violation of R.C. 2911.12, and breaking and entering, in violation of R.C. 2911.13.

Defendant and his brother were originally tried jointly in July 1996. The jury in that trial was unable to reach a verdict, and the trial court declared a mistrial on July 19, 1996.

Defendant and his brother were retried before a jury beginning on January 28, 1997. The evidence at that trial, which is the subject of the instant appeal, indicates the following facts. Daniel Mershon was the owner of the home at 5362 Swisher Road. The house was a single-story structure with a basement and a separate garage. There was an outside entrance to the basement near the back porch. On the date of the fire, Mershon was in Florida; before leaving his Ohio residence, Mershon had nailed a sheet of plywood to cover the outside entrance area to the basement as a security precaution.

The fire at 5362 Swisher Road was first noticed and reported by Mershon's neighbors on the morning of February 5, 1996. At approximately 4:30 a.m., Lisa M. Santo and her husband, who reside at 5350 Swisher Road, were awakened to observe their neighbor's house "totally engulfed in flames."

Sheldon Elam, also a resident on Swisher Road, was awakened at approximately 3:30 that morning by an outside motion detector. Elam got out of bed, went to his kitchen and noticed flames coming from his neighbor's house. Elam dialed 911 and then ran over to the Mershon residence. Not knowing whether anyone was at home, he pounded on the door but received no response from inside. There was some snow on the ground at the time and Elam used a flashlight to look for any possible footprints or signs of trespass on his property, which he did not detect. Later that morning, in the daylight hours, Elam again looked for footprints; the only thing he observed were "most likely * * * [his] own footprints from the night before."

Police and firefighters from Madison Township first arrived on the scene at approximately 4:30 a.m. Donald Skinner, an officer with the Madison Township Police Department, was dispatched to the Mershon residence that morning and he secured the area with crime scene tape. The ground was frozen with a light covering of snow. The house was almost fully engulfed with flames and approximately three-fourths of the roof was destroyed at the time police and fire personnel initially arrived.

Madison Township Police Detective James Galvin arrived at the Mershon residence at approximately 6:00 a.m. Detective Galvin went to the rear of the property and secured that area, making sure nobody went into a field located at the rear of the property. Detective Galvin then requested that a canine unit be dispatched to the fire scene. Franklin County Sheriff's Deputy Matt Schneider arrived at 7:15 a.m. with a tracking dog. The temperature that morning was slightly below zero.

Deputy Schneider took the dog to the back portion of the residence, approximately fifty feet to the rear of the property. After about five minutes, the dog began moving very quickly in a northeast direction. Officer Galvin accompanied Deputy Schneider with the tracking dog. The dog headed in a northeast

direction toward a tree line and fence area that separates the Mershon residence from the property belonging to Mershon's next-door neighbor; the dog then went east along the line, away from the Mershon residence, travelling about two hundred yards through a large field. As Galvin and Schneider followed the dog, they began to notice footprints in the snow. Galvin testified that the tracks appeared to be made by a tennis shoe and a boot.

At trial, Officer Schneider testified that his trailing dog is trained to track ground disturbances, caused when someone steps on the ground; these disturbances in turn emit an odor. Thus, the dog is taught to track based on scent, and the animal "has no idea what a footprint is, other than [the] invisible one that he smells on the ground." Officer Schneider was surprised that the dog picked up a scent that morning because of the extreme weather conditions. Schneider gave his opinion that the tracks the dog picked up could not have been caused by somebody walking across the field twenty-four hours earlier.

After reaching the end of the tree line, the dog went in a northeast direction again, travelling approximately one hundred fifty feet through another portion of field toward Groveport Road. The officers noticed tracks in the snow in a few locations along this route. The dog came to a stop at Groveport Road, at which point there was a large culvert with more significant snow accumulation; the officers noticed distinctive patterns in the tracks at this location. Directly across the road from where the dog had stopped trailing was the residence of the defendant and his brother, co-defendant Louis Weber, located at 5610 Groveport Road. After crossing the road, Galvin observed footprints in the snow that led directly to the front door of the residence. The officers knocked on the door of the house but nobody answered. Officer Galvin instructed other officers, including Officer Skinner, to secure the residence and make sure nobody entered or left the house.

Officer Galvin then went back to the field; he subsequently instructed Captain Gary Jones of the Madison Township Fire Department, along with Richard Stelzer, a fire investigator, to place orange traffic cones along the trail that the dog had just tracked and where the footprints had been discovered. Galvin also dispatched a helicopter to the area, and Stelzer subsequently took aerial photographs of the tracking area.

As noted above, Officer Skinner was one of the officers instructed by Officer Galvin to remain at the defendant's residence. The officer parked his cruiser in the driveway and was in the vehicle for approximately forty-five minutes when he received a dispatch indicating that there was a medical call at the defendant's residence. Paramedics subsequently arrived at 5610 Groveport Road and Officer Skinner entered the residence with the medical personnel. At the scene of the medical emergency, paramedics treated defendant's mother, Florence Weber.

Later that morning, Officer Galvin obtained a search warrant for the defendant's home. Galvin and other officers conducted a search of defendant's residence at approximately 11:30 a.m. During the search, Officer Galvin found a pair of black Spalding high-top tennis shoes near a chair. The defendant told Officer Galvin that the tennis shoes belonged to him.

Officer Galvin took the tennis shoes out to the field he had previously walked through with the tracking dog. Officer Galvin compared the shoes with some of the tracks in the snow. A photograph of the shoe was taken next to the tracks. At trial, Officer Galvin opined that the pair of high-top tennis shoes taken from the house matched the tracks in the snow.

During cross-examination, Officer Galvin stated that casting of the footprints was not performed because there was not enough snow on the ground. The officer also acknowledged that testing had not been performed on the shoes.

Inspector Stelzer, in addition to taking aerial photographs of the tracking area, also took photographs of the tracks in the field. During the investigation that morning, Stelzer observed a pair of hairy, cream colored boots with lug soles, obtained from the co-defendant, along with the pair of tennis shoes belonging to the defendant. Stelzer testified that he found impressions in the snow that had distinguishing features similar to the boots, including one track found approximately forty to fifty feet from the garage of the Mershon residence.

At trial, the state introduced photographs showing defendant's tennis shoe placed beside tracks found along the tree line in the field. Inspector Stelzer testified that the tracks observed in the snow indicated two sets of tracks leading toward the Mershon residence and two sets of tracks leading away from the residence.

Similar testimony was provided by Captain Gary Jones of the Madison Township Fire Department. During the time Officer Schneider and Officer Galvin were following the tracking dog, Jones had walked behind these officers, placing orange traffic cones along the trail. Jones observed two different sets of tracks; one was similar to that made by a tennis shoe with a star print design. The other set of tracks indicated a "lug" pattern on the sole. The sets of tracks indicated two sets of travel, east and west, along the fence line. According to Jones, the footprints he observed nearest to the Mershon residence began approximately one hundred feet from the rear of the house.

Michael L. Madden, a fire investigator with the Columbus Fire Department, conducted an investigation at the Mershon residence to determine the cause and origin of the fire. Madden stated that the outside entrance to the basement of the house appeared to have been forcibly entered. According to Madden, the point of the fire's origin was a closet. Madden ruled out the possibility of any

accidental cause for the fire, such as an electrical malfunction. Madden opined that, on the basis of elimination of natural causes, the fire was intentionally set. He testified that the most likely cause of the fire was "direct flame impingement," a term indicating direct physical contact with a flame, *i.e.*, by a lighter or match.

Madison Township Police Chief Charles Stevens responded to the fire on February 5, 1996, and later that morning he went to the defendant's residence at 5610 Groveport Road. When Stevens arrived at the scene, Florence Weber had been transported to the hospital with a breathing problem, and the defendant and his brother, Louis Weber, had agreed to remove themselves from the residence. When Louis Weber left the house, he was wearing a pair of "fuzzy-furry" mid-calf winter boots.

During this time, defendant was seated in the back seat of a police cruiser and Stevens had an opportunity to speak with him. The defendant asked Stevens why the officers were procuring a search warrant for the house. Stevens explained to the defendant that there had been a fire in the area and that the officers had observed some footprints on the property and across the street. Stevens asked the defendant if he had been outside during the course of the evening. The defendant said "no, that he had been inside all evening because it was so cold."

Following Stevens's testimony, the jury observed a videotape in which the defendant was interviewed by a local news station. The videotape was made on February 5, 1996. On the tape, the defendant is heard telling a television reporter that he had let his dog outside "at eleven o'clock," that he "chased her over in the field," and that it took him about five minutes to get the dog back inside the house.

Defendant did not take the stand and offered no evidence at trial. During deliberations, the jury asked to view the video of the television interview a second time. The trial court allowed the video to be replayed.

Following deliberations, the jury returned verdicts finding defendant guilty of all charges.[1] The trial court sentenced defendant by entry filed February 5, 1997.

On appeal, defendant sets forth the following five assignments of error for review:

"Assignment of Error I.

"The verdict is against the manifest weight of the evidence and the evidence is insufficient to support said conviction.

---

1. Defendant's brother, Louis Weber, was also convicted of all charges in the indictment. A separate appeal by Louis Weber is currently before this court.

"Assignment of Error II.

"The court commits prejudicial error by allowing, over the defense counsel's objection, the playing of a videotape at trial and during jury deliberations, depicting the defendant's brother and co–defendant being taken into custody by the authorities, thereby depriving the defendant of his right to a fair trial under the state and federal constitutions.

"Assignment of Error III.

"The trial court commits prejudicial error when it instructs the jury in a manner which relieved the state from its obligation of proving the mental element of the offense of complicity.

"Assignment of Error IV.

"Prosecutorial misconduct during closing arguments creates reversible error when the prosecutor makes mischaracterizations of evidence and law; disparages defense counsel; and inflames the passions and fears of the jury regarding the criminal justice system.

"Assignment of Error V.

"Defendant's right to effective assistance of counsel is violated when trial counsel fails to move the court to dismiss the charges against the defendant pursuant to R.C. 2945.73 for the state's failure to bring him to trial within the time stated in R.C. 2945.71."

 Defendant's first assignment of error challenges his conviction as not being supported by sufficient evidence and as against the manifest weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546. As to sufficiency of the evidence, " 'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.*, citing Black's Law Dictionary (6 Ed.1990) 1433. A determination as to "[w]hether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins, supra*, at 386, 678 N.E.2d at 546. The relevant inquiry on review of the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. A reversal based on insufficient evidence has the same effect as a not guilty verdict (and thus precludes retrial) because such a determination "means that no rational factfinder could have voted

to convict the defendant." *Tibbs v. Florida* (1982), 457 U.S. 31, 41, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652, 661.

As opposed to the concept of sufficiency of the evidence, the court in *Thompkins* noted:

"Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.'* (Emphasis added.) Black's, *supra,* at 1594.

"When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony. * * * " (Citations omitted.) *Thompkins, supra,* 78 Ohio St.3d at 387, 678 N.E.2d at 546–547.

In *Thompkins,* the court cited with approval language from *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720, in which that court held that, in considering a manifest-weight challenge, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." In *State v. Conley* (Dec. 16, 1993), Franklin App. No. 93AP–387, unreported, 1993 WL 524917, this court noted that, when called upon to consider the issue of manifest weight of the evidence, "the appellate court must engage in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt."

We begin our analysis with defendant's challenge to the sufficiency of the state's evidence. As previously noted, defendant was found guilty of the offenses of aggravated arson, aggravated burglary, burglary and breaking and entering. R.C. 2909.02 defines aggravated arson as follows: "No person, by means of fire or explosion, shall knowingly * * * cause physical harm to any occupied structure." At the time of the offense, R.C. 2911.11 defined "aggravated burglary" as follows:

"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * with purpose to commit therein * * * any felony, when any of the following apply:

" * * *

"(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present."

R.C. 2911.13 sets forth the elements of breaking and entering, and provides that no person, by force, stealth, or deception, shall trespass in an unoccupied structure with the intent to commit a theft offense or a felony inside the structure.

In considering the sufficiency of the evidence as to each of the charged offenses, we note that defendant does not seriously contest the fact that the state presented evidence indicating that the victim's house was entered and that a fire was deliberately set. It is contended, however, that the state failed to present sufficient evidence to show that it was defendant who trespassed on the property or committed the arson. Defendant notes that the evidence only shows that the nearest footprint found in the field was approximately fifty feet from the garage of the Mershon residence; thus, defendant argues, the state failed to prove that he committed a trespass inside the residence. Defendant also asserts that the state's presentation of evidence regarding the use of a tracking dog is of little probative value.

Viewed in a light most favorable to the prosecution, the evidence indicates that there was a forced entry into the residence through an outside entrance to the basement. A fire investigator ruled out any accidental cause for the fire, and concluded that the fire was intentionally set inside a closet. Thus, the state presented evidence which, if believed, established that force was used to enter the Mershon home and that such force was used with the purpose to commit a felony, i.e., arson.

Regarding the issue of who set the fire, defendant's presence at the fire scene was inferred from the discovery of footprints in snow leading to within fifty feet of the burned residence. Specifically, two sets of tracks were observed leading to the Mershon residence and two sets of tracks leading away. The tracks leading away from the fire scene were trailed by a tracking dog along a fence and tree line in a field; the tracks then went across another field to a road directly across from the defendant's residence. Tracks were also observed across the road leading to defendant's front door. The tracks in the snow indicated that the shoes had distinct patterns. Tennis shoes belonging to the defendant and boots worn by defendant's brother were recovered from defendant's residence and compared with the tracks found in the field; the patterns from the soles of the

boots and tennis shoes taken from defendant's residence matched patterns made in the snow leading to and from the Mershon residence.

Regarding defendant's contention that the dog-tracking evidence was lacking in probative value, we note that Ohio is one of a number of jurisdictions which allows the admission of evidence of trailing by a tracking dog provided that a proper preliminary foundation has been met. See, *e.g., State v. Bridge* (1989), 60 Ohio App.3d 76, 573 N.E.2d 762; *State v. Dickerson* (1907), 77 Ohio St. 34, 82 N.E. 969. In the present case, it is not disputed that a proper foundation was established for Officer Schneider to testify regarding this evidence. The record further indicates that the jury was instructed, pursuant to the holding in *Bridge,* that "dog trailing evidence must be viewed with caution; that is, it is of slight probative value; that it must be considered, if found reliable, not separately but in conjunction with all the other testimony and in the absence of some other direct evidence of guilt would not warrant a conviction." Inasmuch as a proper foundation was laid, the trial court did not err in admitting this testimony; the weight to be given such evidence, under our review of the sufficiency of the evidence, was a matter for the jury's determination.

The fact that no tracks were found leading directly to an entrance of the Mershon residence loses significance when viewed in the context of crime scene photos indicating that there was only a light snow on the ground at the time and that any snow close to the house melted as a result of the heat of the fire. Stated otherwise, a rational trier of fact could have reasonably concluded that whoever made tracks at the back of the Mershon property may have continued walking up to the house even though the ground conditions, as a result of the fire, would not have revealed such tracks.

There was evidence indicating that no tracks other than those leading from the direction of Groveport Road toward the scene of the fire were found at the rear of the Mershon residence. We further note that the area of the forced entry was in the rear of the house. Testimony by the officer who handled the tracking dog indicated that the footprints leading to and from the Mershon residence could not have been more than twenty-four hours old.

The state also presented evidence of apparently conflicting statements made by defendant following the fire. Specifically, Madison Township Police Chief Charles Stevens testified regarding a conversation he had with the defendant as they were sitting in a police cruiser at defendant's residence on the morning of the incident. Officer Stevens stated that "we had some conversation with regard to his whereabouts, as opposed to during the course of the evening, and I asked him if he had been in the field or outside. And he said, no, that he had been inside all evening because it was so cold." Following Stevens's testimony, the state showed a video of defendant speaking with a television reporting crew; on

the video, defendant is heard stating that, at "eleven o'clock," he took his dog outside and the dog started running; defendant stated that he chased the dog "in the field" for about five minutes before going back inside.

■ Under Ohio law, circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Jenks* (1991), 61 Ohio St.3d 259, 272, 574 N.E.2d 492, 502–503. Thus, whether considering circumstantial or testimonial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." *Holland v. United States* (1954), 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150, 167. In both instances, "the jury must use its experience with people and events in weighing the probabilities." *Id.*

■ Based upon the very nature of the crime, proof of arson must, of necessity, often rely heavily on circumstantial evidence. *State v. Pruiett* (Apr. 15, 1987), Summit App. No. 12858, unreported, 1987 WL 9839. Thus, in the present case "[t]he state was not required to introduce into evidence the testimony of someone who actually witnessed [the defendant] * * * set the fire." *State v. Hoak* (Aug. 9, 1995), Lorain App. No. 94CA005917, unreported, 1995 WL 471383. Rather, "[t]he element of knowledge required for a finding of aggravated arson can be established by circumstantial evidence." *Id.*

■ A summary of the evidence presented by the state to establish the elements of the crimes indicates the following facts: a forced entry into the Mershon residence; an intentional fire; the presence of two sets of tracks leading from the area of defendant's residence to within fifty feet of the fire scene and two sets of tracks leading back toward defendant's home; testimony that the tracks were less than twenty-four hours old; dog-trailing evidence tracking the path of the trail from within fifty feet of the Mershon residence towards the location of the accused's residence; testimony and photographic evidence indicating that the shoes belonging to defendant and his brother had patterns on the soles that matched patterns made in the snow; and conflicting statements by defendant about whether he had been outside in the evening. Upon review of the evidence, which we are bound to examine in the light most favorable to the state, and with all credibility determinations and inferences left within the purview of the jury, we find that the state presented evidence which, if believed, was minimally sufficient to justify an inference that defendant was connected to the fire, and thus such evidence was legally sufficient to support the verdict in this case. See, *e.g.*, *Alleyn v. Warden* (M.D.Pa.1995), 878 F.Supp. 30 (circumstantial evidence that defendant was at house that burned based upon witness's testimony that he tracked footprints leading from fire scene to area where defendant was arrested and that impression made by defendant's shoes matched tracks in snow

was sufficient to support a conviction, beyond a reasonable doubt, that defendant set fire to house); *Goodin v. State* (1928), 27 Ohio Law Rep. 34 (conviction for arson supported by sufficient evidence based upon contradictory statements by defendant regarding his whereabouts, his threats of vengeance and tracks leading from fire scene which matched defendant's shoes).

Having found sufficient evidence upon which the jury could have found defendant guilty of the charged offenses, we now turn to defendant's argument that his conviction was against the manifest weight of the evidence. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins, supra,* 78 Ohio St.3d at 387, 678 N.E.2d at 546. The test to be applied by a reviewing court in considering a manifest-weight claim is much broader than that available under a sufficiency analysis. *Martin, supra,* 20 Ohio App.3d at 175, 20 OBR at 218–219, 485 N.E.2d at 720–721. In contrast to a sufficiency review, an appellate court, in deciding whether a conviction is against the manifest weight of the evidence, "determines whether the state has appropriately carried its burden of persuasion. A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." *Thompkins, supra,* 78 Ohio St.3d at 390, 678 N.E.2d at 549. (Cook, J., concurring.)

As previously discussed, the most highly contested issue before the jury in this case was not whether there had been a trespass and intentional fire at the Mershon residence but, rather, whether the state presented sufficient evidence linking defendant as a participant in the criminal agency. In order to resolve this issue, the trier of fact, faced with mostly circumstantial evidence, was asked to draw inferences primarily from facts strongly suggesting that defendant, who lived in the area of the arson, had at some time walked across some nearby fields toward the Mershon residence. However, the mere presence of an accused at or near the scene of a crime does not conclusively establish that the accused committed the crime. Thus, relevant to the jury's determination would be evidence of the time lapse between the commission of the arson and when the tracks were made, whether the evidence precluded the opportunity for anyone else to have committed the crime, and, under the particular facts of this case, the import of any actions or statements by the defendant.

In the present case, evidence regarding the possible age of the tracks was presented by Officer Schneider, the handler of the tracking dog. Specifically, Officer Schneider was asked the following during direct examination:

"Q. Have you had experience with * * * [the dog] in tracking different tracks, starting with fresh tracks and tracks that are several days old?

"A. I don't know about several days old, but we have had experience with different ages of tracks, which we do in training.

"Q. And in your opinion, could the tracks that * * * [the dog] followed or the scents * * * picked up, could they have been caused by somebody walking across that field, say, 24 hours earlier?

" * * * [Defense Counsel]: Objection, no foundation.

"THE COURT: Overruled. You may answer the question.

"THE WITNESS: In my opinion, no."

During cross-examination, the following exchange occurred between the witness and counsel for the co-defendant:

"Q. You were asked how—if you had an opinion of how old the tracks were, and you said they probably were not 24 hours old?

"A. That is correct.

"Q. But in your experience, you cannot really pinpoint exactly when those tracks were made?

"A. No, you cannot."

Thus, on the critical issue of when the tracks could have been made, although the officer gave an opinion on direct examination that he did not believe the tracks were made by someone walking in the field twenty-four hours earlier, the witness acknowledged on cross-examination that he really could not pinpoint when the tracks had been made. Further, Officer Schneider indicated during direct examination that he did not have experience with tracks that might be "several days old." While the question of when the tracks were made was clearly of probative value to the trier of fact, the uncertainty expressed by the witness detracts from the probative force of the state's evidence on this issue.

As to the equally important issue of when the fire may have started, the state's evidence is ambiguous. While there was testimony by one of Mershon's neighbors indicating that he first noticed flames at 3:30 a.m. on February 5, none of the state's expert witnesses placed even an approximate time as to when the fire may have been set. Investigator Madden, who investigated the fire scene, testified only that his findings indicated that "the fire burned for a long time." Madden, however, did not quantify this statement, leaving the issue to the jury's conjecture.

In light of the sketchy state of this evidence, we note concern regarding the manner in which this evidence was summarized to the jury by the prosecution

during closing argument. Specifically, during the state's rebuttal in closing, the prosecution argued that "[w]e know * * * [those foot tracks] were set within 24 hours. * * * So the tracks are set at the same time this fire starts." As previously noted, however, the state, during its case in chief, failed to establish a timeframe for when the fire may have started. Thus, the trier of fact was asked to draw inferences from facts which, on at least one important issue, lacked an adequate basis. Moreover, the state, during closing argument, represented such facts to the jury as conclusively proven. While we do not find that the prosecution intentionally misled the jury, our concern is that the jury lost its way in resolving these issues based upon the state's characterization as to the strength of this evidence.

Defendant argues that one of the important conflicts of evidence presented to the jury for its resolution involved the issue of the alleged discrepancy between statements made by defendant to the news media and to the police chief. As previously noted, Madison Township Police Chief Charles Stevens testified that he asked defendant whether he had been outside during the evening. According to Stevens, defendant stated that he had been inside all evening because of the cold weather. Following Stevens's testimony, the state introduced a video filmed by a local news station. On the video, defendant states that at "eleven o'clock," he let his dog out, that the dog ran "that way" (pointing), and that he chased the dog "over in the field" for approximately five minutes.

At the outset, we note that a review of the video reveals that the question asked by the reporter to defendant is not part of the audio portion of the tape. Further, while defendant is seen pointing on the video, and he states that he chased his dog "in the field," it is not clear from the video as to the direction he is pointing or whether he is referring to the field in which the tracks were discovered.

Defendant argues that the statements at issue are not irreconcilable. Upon review, we agree that the statements do not, depending on the context, present a clear-cut discrepancy. Specifically, we cannot say that the average person, when asked whether he had been outside on a given evening, would necessarily consider a normal routine, such as taking a dog outside, to fall within the scope of that inquiry. Thus, viewing the statements in that light, they are not irreconcilable. Even assuming, however, that defendant meant to mislead the officer as to whether he was outside, this is but a suspicious circumstance and does not constitute credible proof of consciousness of guilt to commit arson.

While we cannot be sure how much weight the jury gave to this evidence, the record suggests that the statements played a role in the jury's deliberations. Specifically, during deliberations, the jury sent a number of questions to the court, including a request to again view the video containing defendant's state-

ment to the news media. The jury also sent the following request to the court: "What did Julius say to Chief Stevenson [sic] in the police car?" While the trial court allowed the video to be replayed, the jurors were told to rely on their collective memories regarding the statement to the police chief. Within an hour of viewing the video, the jury returned their verdict in the case. Although the average juror might view the apparently conflicting statements as indicative of guilt, we find that the alleged discrepancy, while possibly suspicious, does not provide a logical basis for concluding that defendant knowingly engaged in the commission of an arson.

We note that the news video admitted in this case contained other material which may have further served to confuse the jury in its deliberations. Specifically, the video depicts Louis Weber being led by a police officer in a manner suggesting that he may have been under arrest. The record in this case, which includes a transcript from a suppression hearing, indicates that the co-defendant was arrested that morning on a prior charge. Although evidence of the arrest was not before the jury, the jury was made aware during the trial that the co-defendant was at the police station on the morning of fire. During deliberations, the jurors sent three questions to the trial court in reference to the co-defendant being at the police station. Specifically, the jury twice asked the court: "When was Louis taken to the police station?" The jurors also requested to know "why was Louis at the police station?" The questions raised by the jurors during deliberations indicate to this court that the depiction of the co-defendant on the video may, at the least, have served to detract the jury from the real issues before it and, at worst, prejudiced the verdicts in this case.

Based upon this court's review of the evidence, in which the state presented evidence of tracks coupled with little more than an alleged inconsistent statement by the defendant, we find that there is a lack of competent, credible evidence from which a trier of fact, applying a reasonable doubt standard, could return a verdict of guilt. We are cognizant that a jury verdict in a criminal case should not be overturned lightly and that the discretionary power to grant a new trial should be exercised only in exceptional cases. *Martin, supra,* 20 Ohio App.3d at 175, 20 OBR at 218–219, 485 N.E.2d at 720–721. However, while under a sufficiency review, which precludes us from assessing the weight and credibility of the evidence, we found that the evidence construed most strongly in favor of the state was sufficient to support the verdict, we are unable to reach the same determination under a manifest-weight analysis. Rather, the evidence presented by the state in this case is marked by uncertainties and a lack of sufficient probative evidence on crucial factual issues, which, based upon our review, leads us to conclude that the verdict in this case was manifestly against the weight of the evidence.

Giving little weight to the apparent conflict in defendant's statements, what remains is a record indicating the presence of tracks, which, in the absence of other probative evidence, merely casts a degree of suspicion on the defendant. While there was evidence by the state indicating that other tracks were not found in the field behind the Mershon residence, such evidence does not preclude the possibility that someone else entered the property from either the front or sides of the house. Testimony at trial, as well as photographic evidence of the arson scene, indicated that a number of individuals, including neighbors, police and fire personnel, left tracks around the front and sides of the house; the activity was so pervasive that the tracking dog could not be employed in those areas. Further, as previously discussed, while there was testimony indicating that the tracks in the field were not more than twenty-four hours old, the state's evidence linking the tracks to the time the fire may have started was far from conclusive. We also note that, while the state was not required to prove motive, the trier of fact in this case was faced with a total absence of evidence of motive on the part of the defendant.

Thus, while the evidence suggests that defendant had the opportunity to have committed the crime based upon the presence of tracks in the snow, as previously noted, the mere presence of an accused at a crime scene does not establish that the accused committed the crime. See, *e.g., State v. Woods* (1988), 48 Ohio App.3d 1, 6, 548 N.E.2d 954, 960 ("[t]he mere presence of the accused during the commission of a crime does not make him an accomplice"). Accordingly, in weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we conclude that the interests of justice require that we reverse and remand for a new trial.

Accordingly, defendant's first assignment of error is sustained in part and overruled in part. Based upon our disposition of the first assignment of error, reversing and remanding this case for a new trial, defendant's remaining assignments of error are rendered moot.

Based upon the foregoing, defendant's first assignment of error is sustained in part and overruled in part, defendant's second, third, fourth and fifth assignments of error are rendered moot, the judgment of the trial court is reversed, and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

TYACK, P.J., and BOWMAN, J., concur.