[Cite as *State v. Short*, 2024-Ohio-92.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 22AP-543<br>(C.P.C. No. 20CR-5345) |
| v. | : | (REGULAR CALENDAR) |
| Rashad B. Short, | : | No. 22AP-544<br>(C.P.C. No. 21CR-0410) |
| Defendant-Appellant. | : | |
| | : | (REGULAR CALENDAR) |

---

D E C I S I O N

Rendered on January 11, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert* for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Yeura R. Venters,* Public Defender, and *George M. Schumann* for appellant. **Argued:** *George M. Schumann*.

---

APPEALS from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Following a jury trial, defendant-appellant, Rashad B. Short, was found guilty of crimes associated with the April 23, 2020 fatal shooting of J.G., the May 28, 2020 shooting death of D.M., and the May 28, 2020 nonfatal shooting of T.G. On appeal, Mr. Short argues the jury's verdict of guilt as to all counts is against the manifest weight of the evidence. As to the counts related to the May incident involving D.M. and T.G. (Counts Four through Nine), we disagree. But after examination of the full record, we conclude that the jury's verdict of guilt as to the counts charged in connection with the April 2020 shooting death of J.G. (Counts One through Three) is against the manifest weight of the evidence. Finding merit to Mr. Short's first assignment of error, we reverse, in part, the

August 2, 2022 judgment entered by the Franklin County Court of Common Pleas and remand this matter to the trial court for proceedings consistent with this decision.

## I.   PROCEDURAL BACKGROUND

{¶ 2}   On November 12, 2020, a Franklin County grand jury returned a 16-count indictment in case No. 20CR-5345 charging Mr. Short with, among other offenses, two counts of aggravated murder, one count of attempted murder, and one count of aggravated burglary.   Mr. Short was subsequently indicted with two counts of felony drug possession—both charged with gun specifications—in case No. 21CR-0410 after police recovered a firearm, fentanyl-related compound, and cocaine when arresting Mr. Short for the homicide case.   Pursuant to the state's unopposed motion for joinder, the trial court ordered these two cases be joined into a single action for trial on July 14, 2022.

{¶ 3}   Trial commenced on July 18, 2022. Before voir dire, however, Mr. Short waived his right to a jury trial for Counts 12 through 16 in case No. 20CR-5345 and both drug counts charged in case No. 21CR-0410.   (*See* July 18, 2022 Jury Waiver.  *See also* July 18, 2022 Tr. Vol. I at 12-14.)   Also prior to trial, the state moved to dismiss Counts 10 and 11 in the homicide case. (Tr. Vol. I at 11-12.)   Thus, the jury only heard evidence relevant to the aggravated murder, purposeful murder, and felony murder of J.G. (Counts One, Two, and Three); the aggravated burglary of D.M. and/or T.G. (Count Four); the aggravated murder, purposeful murder, and felony murder of D.M. (Counts Five, Six, and Seven); and the attempted murder and felonious assault of T.G. (Counts Eight and Nine). Each of these nine counts was charged with a three-year firearm specification.

{¶ 4}   While the jury deliberated on these nine counts, Mr. Short pled guilty to the second-degree felony drug possession offense alleged in Count Two of case No. 21CR-0410, as well as the accompanying one-year firearm specification. (*See* July 28, 2022 Tr. Vol. VIII at 1123-34.)   In exchange for Mr. Short's guilty plea, the state moved to dismiss the first-degree felony drug possession offense charged in Count One of that case, as well as Counts 12 through 16 in case No. 20CR-5345.   (*See* Tr. Vol. VIII at 1123-24; Aug. 2, 2022 Jgmt. Entry at 1.)

{¶ 5}   On July 28, 2022, the jury returned a verdict finding Mr. Short guilty of Counts One through Nine and their accompanying firearm specifications. Mr. Short

appeared for sentencing on August 2, 2022. After appropriately merging all allied offenses of similar import, the trial court sentenced Mr. Short in case No. 20CR-5345 as follows:

- **Count One (merged with Counts Two and Three):** Mandatory 30 years to life imprisonment for the aggravated murder offense and 3 years for the firearm specification.

- **Count Four:** 6 to 9 years for the aggravated burglary offense and 3 years for the firearm specification.

- **Count Five (merged with Counts Six and Seven):** Mandatory 30 years to life imprisonment for the aggravated murder offense and 3 years for the firearm specification.

- **Count Eight (merged with Count Nine):** 7 to 10.5 years for the attempted murder offense and 3 years for the firearm specification.

(Sentencing Tr. at 26-28; Aug. 2, 2022 Jgmt. Entry at 2.) The trial court also imposed a prison sentence of 8 to 12 years for the second-degree felony drug possession offense Mr. Short pled guilty to in case No. 21CR-0410 and a one-year prison sentence for its accompanying firearm specification. (Sentencing Tr. at 28.)

{¶ 6} After making the statutory findings regarding the necessity of consecutive prison sentences, the trial court ultimately sentenced Mr. Short to a total aggregate prison term of 86 to 92.5 years to life for both cases. (Aug. 2, 2022 Jgmt. Entry at 2; Sentencing Tr. at 28-36.) Mr. Short now appeals from the judgment of conviction entered in connection with the homicide case.

## II. ASSIGNMENTS OF ERROR

{¶ 7} On September 8, 2022, Mr. Short requested leave from this court to file a delayed appeal pursuant to App.R. 5. We granted the motion on September 20, 2022. Mr. Short raises the following two[1] assignments of error for our review:

---

[1] Mr. Short's merit brief included a third assignment of error challenging the constitutionality of 2018 Am.Sub.S.B. No. 201, the "Reagan Tokes Law." While this case was pending, however, the Supreme Court of Ohio issued a decision finding the law to be facially constitutional. *See State v. Hacker*, ____ Ohio St.3d ____, 2023-Ohio-2535. Pursuant to that decision, Mr. Short filed a written notice of voluntary withdrawal of his third assignment of error on August 28, 2023.

[I.] THE VERDICTS OF GUILT AS TO COUNTS ONE (AGGRAVATED MURDER/R.C. 2903.01), TWO (MURDER/R.C. 2903.02), AND THREE (FELONY MURDER WHILE COMMITTING FELONIOUS ASSAULT/R.C. 2903.02), PERTAINING TO THE HOMICIDE OF [J.G.], ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[II.] THE VERDICT OF GUILT AS TO COUNT FOUR (AGGRAVATED BURGLARY/R.C. 2911.11/F1 OF [] PONTIAC STREET), AND THE VERDICTS OF GUILT AS TO COUNTS FIVE (AGGRAVATED MURDER/R.C. 2903.01), SIX (MURDER/R.C. 2903.02), AND SEVEN (FELONY MURDER WHILE COMMITTING FELONIOUS ASSAULT/R.C. 2903.02), PERTAINING TO THE HOMICIDE OF [D.M.], AND THE VERDICTS OF GUILT AS TO COUNTS EIGHT (ATTEMPTED MURDER/[R.C.] 2923.02/R.C. 2903.02/F1) AND NINE (FELONIOUS ASSAULT/R.C. 2903.11/F2), PERTAINING TO [T.G.], ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. ANALYSIS

{¶ 8}   In his first and second assignments of error, Mr. Short does not dispute that the state presented sufficient evidence as to all of the elements of the offenses for which he was found guilty. Instead, he contends that the jury's verdicts for Counts One through Nine in case No. 20CR-5345 are against the manifest weight of the evidence. More specifically, his first assignment of error relates to the April 23, 2020 shooting of J.G. (Counts One through Three), and his second assignment of error pertains to the May 28, 2020 burglary and shooting of D.M. and T.G. (Counts Four through Nine).

### A. Standard of Review

{¶ 9}   Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See, e.g.*, *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, *State v. Thompkins*, 78 Ohio St.3d 380, 386-87 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Thompkins* at 387, citing *State v. Robinson*, 162 Ohio St. 486, 487 (1955).

{¶ 10}   "Weight of the evidence" concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other.

*State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, quoting *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *Thompkins* at 387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, we sit as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 388, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, ¶ 26.

{¶ 11} In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See, e.g.*, *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10; *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 12} Although we review credibility when evaluating a challenge to the manifest weight of the evidence on appeal, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g.*, *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-131, 2021-Ohio-3803, ¶ 64, citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). This is because the trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 13} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### B. Applicable Law

{¶ 14} On appeal, Mr. Short argues the jury's verdict of guilt is against the manifest weight of the evidence by contesting the state's proof of identity, which was supported, in large part, by T.G.'s testimony at trial. In support of that challenge, Mr. Short generally

contends that T.G.'s testimony was not credible for various reasons and emphasizes the lack of physical evidence linking him to the two shootings.

**{¶ 15}** It is well-established that "[e]very criminal prosecution requires proof that the person accused of the crime is the person who committed the crime." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 15. *See also State v. Harris*, 12th Dist. No. CA2007-11-280, 2008-Ohio-4504, ¶ 12; *State v. Fabal*, 10th Dist. No. 20AP-86, 2021-Ohio-1793, ¶ 26. "This truism is reflected in the state's constitutional burden to prove the guilt of 'the accused' beyond a reasonable doubt." *Tate* at ¶ 15, citing *In re Winship*, 397 U.S. 358, 364 (1970). This necessarily means the jury's verdict identifying the defendant as the person who committed the crime must be supported by sufficient evidence and must not be against the manifest weight of the evidence.

**{¶ 16}** As with any other element of a crime, identity of the perpetrator may be established by direct or circumstantial evidence. *State v. Watkins*, 10th Dist. No. 14AP-807, 2016-Ohio-1029, ¶ 22, quoting *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18. "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.' " *Fabal* at ¶ 26, quoting *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, ¶ 13. In contrast, circumstantial evidence is the " 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.' " (Further citations omitted.) *State v. Wright*, 10th Dist. No. 18AP-770, 2019-Ohio-5201, ¶ 22, quoting *State v. Robinson*, 10th Dist. No. 17AP-5, 2018-Ohio-1809, ¶ 20.

**{¶ 17}** Direct and circumstantial evidence are of equal evidentiary value. *Robinson* at ¶ 20, citing *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991). And, "lack of physical evidence, standing alone, does not render an appellant's conviction against the manifest weight of the evidence." *State v. Glenn-Coulverson*, 10th Dist. No. 16AP-265, 2017-Ohio-2671, ¶ 44, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12, and *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16. Additionally, we have long recognized that " '[t]he testimony of one witness, if believed by the jury, is enough to support a conviction.' " *State v. Williams*, 10th Dist. No. 14AP-546, 2015-Ohio-1136, ¶ 27, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. " '[W]here a

factual issue depends solely upon a determination of * * * the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding * * * as being against the manifest weight of the evidence.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26.

{¶ 18} We first address Mr. Short's manifest weight challenge to the state's evidence proving his identity as the perpetrator of the May 28, 2020 burglary and shooting of D.M. and T.G. (Counts Four through Nine), raised in his second assignment of error. Then, we turn to Mr. Short's arguments regarding the state's proof of identity as to the April 23, 2020 shooting of J.G. (Counts One through Three), which are presented in his first assignment of error.

### C. Second Assignment of Error—May 28, 2020 Burglary and Shooting of D.M. and T.G. (Counts Four through Nine)

{¶ 19} Mr. Short's second assignment of error pertains to the May 28, 2020 burglary and shooting of D.M. and T.G., which resulted in significant injury to T.G. and the death of T.G.'s brother, D.M., at D.M.'s Pontiac Street apartment in the North Linden neighborhood. He argues his convictions for the corresponding offenses charged in Counts Four through Nine are against the manifest weight of the evidence.

{¶ 20} Although Mr. Short's statement of his second assignment of error references all six counts, we limit our analysis of his manifest weight challenge to the offenses charged in Counts Four, Five, and Eight for which he was sentenced, as Counts Six, Seven, and Nine were merged for purposes of sentencing.[2] *See State v. McKinney*, 10th Dist. No. 08AP-23, 2008-Ohio-6522, ¶ 44. *See also State v. Kpoto*, 10th Dist. No. 19AP-492, 2020-Ohio-3866, ¶ 13, 16-21.

{¶ 21} Our review of Mr. Short's second assignment of error is further limited because he only argues that "the state failed to prove beyond a reasonable doubt his identity as the person who shot [D.M.] and [T.G.]." (Brief of Appellant at 23.) Since Mr. Short's arguments only concern the weight of the state's evidence establishing his identity as the

---

[2] If we found Mr. Short's convictions under Count Five (aggravated murder of D.M.) or Count Eight (attempted murder of T.G.) to be against the manifest weight of the evidence, however, we would also evaluate the evidence underlying the offenses charged in Counts Six and Seven (murder of D.M.) or Count Nine (felonious assault of T.G.). Such additional analysis is not necessary in this case.

perpetrator of these offenses, we must presume the state proved, beyond a reasonable doubt, all other essential elements of the aggravated burglary (Count Four), aggravated murder (Count Five), and attempted murder (Count Eight) offenses for which Mr. Short was found to be guilty.

{¶ 22} At trial, T.G. testified unequivocally that he was familiar with Mr. Short, who he knew as "Gator." (July 19, 2022 Tr. Vol. II at 316-18, 348-49, 354-58, 363-64.) This is because Mr. Short supplied D.M. with fentanyl to sell. (Tr. Vol. II at 316-17.) Indeed, T.G. testified that he first became acquainted with Mr. Short a few months prior to the May 28, 2020 shooting, and estimated that he saw Mr. Short at D.M.'s apartment approximately twice a week during that time period. (Tr. Vol. II at 317-18, 334, 338-40.)

{¶ 23} T.G. testified that Mr. Short shot him and D.M. on May 28th. (Tr. Vol. II at 316-17, 323-29, 354, 356. *See also* July 26, 2022 Tr. Vol. VI at 876-77.) More specifically, T.G. described Mr. Short arriving at D.M.'s Pontiac Street apartment in the early morning of May 28th while he and D.M. were watching television. (Tr. Vol. II at 320-21.) T.G. testified that after exchanging greetings with D.M., Mr. Short "flipped his hood off, asked [T.G.] what [he] was looking at, pulled [out] his gun[,]" shot D.M., and then shot T.G. multiple times, striking him in his stomach, leg, and arm. (Tr. Vol. II at 321-27. *Compare* Tr. Vol. IX[3] at 6-7 (during his July 21, 2020 interview with detectives, T.G. denied that Mr. Short said anything to him that night.)) After the shooting, the perpetrator fled the scene and T.G. ran to a neighbor's home to seek medical and police assistance. (Tr. Vol. II at 324-27. *See* Tr. Vol. VI at 891-92.) D.M. succumbed to his gunshot wound injuries, while T.G. ultimately recovered after spending approximately five months in the hospital. (*See* Tr. Vol. II at 327; July 21, 2022 Tr. Vol. IV at 669-75.)

---

[3] During T.G.'s cross-examination, the defense played portions of detectives' July 21, 2020 audio-recorded interview of T.G. in open court to impeach T.G.'s direct examination testimony. The state was then permitted to play longer segments of the recording pursuant to the Evid.R. 106, the rule of completeness. (*See* Tr. Vol. III at 410-21, 425-29.) The state began playing the recording at 0:00 but stopped it at some point after 7:51, when the trial court sustained a defense objection. (Tr. Vol. III at 425-27.) In the trial transcript originally prepared and filed by the court reporter on January 3, 2023, the portions of the audio-recorded interview played in open court were not transcribed. And, the audio recording of T.G.'s July 21, 2020 interview was not admitted as an exhibit at trial. Thus, with the agreement of both parties, a transcript of the segment played in open court was prepared by the court reporter and filed on October 26, 2023. Of note, the filed transcript misstates the date of the interview it transcribes. (*Compare* Tr. Vol. II at 362, 365-66, 369, 372, 386; Tr. Vol. III at 415-21; Tr. Vol. VI at 912, 918-24.) To ameliorate any confusion that might arise given these circumstances, we refer to the transcript filed on October 26, 2023 as "Tr. Vol. IX."

{¶ 24} In support of his second assignment of error, Mr. Short contends that T.G.'s testimony identifying Mr. Short as the person who shot both T.G. and D.M. was not credible for several reasons. But, as explained below, none of those reasons are compelling enough for us to set aside the jury's findings of guilt for those offenses and reverse the aggravated burglary, aggravated murder, and attempted murder convictions for which Mr. Short was sentenced.

{¶ 25} At the outset, we acknowledge that there were minor inconsistencies between T.G.'s testimony and the evidence presented at trial. Indeed, as Mr. Short points out, T.G. testified he never touched a firearm, but his DNA was recovered on an ammunition magazine found at the scene. (Brief of Appellant at 22. *See* Tr. Vol. II at 376-77.) We also note that T.G. gave different reasons as to why he thought Mr. Short attacked him and his brother. During his direct examination testimony, T.G. claimed that Mr. Short and D.M. had not been on good terms because D.M. owed Mr. Short money. (Tr. Vol. II at 340.) T.G. also testified that D.M.'s friend, A.F., caused tension between D.M. and Mr. Short. (*See* Tr. Vol. II at 337, 340-42.) Specifically, T.G. claimed Mr. Short suspected D.M. "was hiding [A.F.] from [Mr. Short] because [Mr. Short] wanted to kill him." (Tr. Vol. II at 340. *See also* Tr. Vol. IX at 17.) T.G. maintained, however, that Mr. Short's suspicion was unfounded. (*See* Tr. Vol. II at 340.)

{¶ 26} However, on cross-examination—but only after he was impeached with his prior audio-recorded statements to the police—T.G. provided a different explanation as to why D.M. and Mr. Short were not on good terms on May 28th. Initially, T.G. denied telling detectives during his July 21, 2020 interview that "this whole situation was over some bad drugs." (Tr. Vol. II at 365.) He also denied previously telling detectives that, on the night they were shot, D.M. and T.G. knew Mr. Short was coming to D.M.'s apartment to replace "bad drugs" Mr. Short had given to D.M with "better drugs." (*See* Tr. Vol. II at 365. *Compare* July 20, 2022 Tr. Vol. III at 431; Tr. Vol. IX at 9-14.) But, that testimony was ultimately impeached when T.G.'s audio-recorded interview with police was played in open court. (*See* Tr. Vol. III at 415-17, 431. *See also* Tr. Vol. II at 367-68; Tr. Vol. IX at 9-14.) After hearing his interview with detectives and correcting his prior testimony during cross-examination, T.G. also acknowledged telling detectives on July 21st that, shortly before Mr. Short arrived at D.M.'s apartment on May 28th with the "better drugs," he and D.M. had

discussed killing Mr. Short because Mr. Short had been "pressing up against [T.G.'s] brother." (Tr. Vol. III at 417-18. *See* Tr. Vol. IX at 9-14. *See also* Tr. Vol. VI at 877.)

**{¶ 27}** But, even though conflicting evidence was presented at trial, a defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented." *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29. *See also State v. J.E.C.*, 10th Dist. No. 12AP-584, 2013-Ohio-1909, ¶ 42. It is well-established that a jury may consider conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or otherwise resolving the discrepancies. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 34, citing *Midstate Educators Credit Union, Inc. v. Werner*, 175 Ohio App.3d 288, 2008-Ohio-641, ¶ 28 (10th Dist.). " 'The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact.' " *Petty*, 2017-Ohio-1062 at ¶ 63, quoting *State v. Mullins*, 10th Dist. No. 16AP-236, 2016-Ohio-8347, ¶ 39. *See also State v. Mann*, 10th Dist. No. 10AP-1131, 2011-Ohio-5286, ¶ 37, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, *7 (May 28, 1996) (" 'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence' "). As such, the jury was in the best position to weigh evidence relating to T.G.'s credibility in making its determination, and such determination is entitled to great deference from a reviewing court. *See Taylor* at ¶ 37.

**{¶ 28}** Mr. Short also attempts to undermine the credibility of T.G.'s identification of Mr. Short as the May 28th shooter by suggesting that the absence of cell phone evidence corroborating T.G.'s testimony about phone conversations he overheard between D.M. and Mr. Short prior to and on May 28th (*see* Tr. Vol. II at 323, 331-33, 353; Tr. Vol. III at 417, 421, 431, 434) somehow renders that testimony false. (*See* Brief of Appellant at 22.) We disagree. True, Columbus Police Department ("CPD") Detective Delbert Chapman conceded on cross-examination that law enforcement did not find any "text messages, emails, Snapchats, [or] anything" in the data extracted from D.M. and T.G.'s cell phones—which police seized from D.M.'s apartment on May 28, 2020—"that would have tied [D.M.] and [T.G.] to Rashad Short[.]" (*See* Tr. Vol. VI at 927-29.) But, we do not believe the

absence of such evidence impinges on the credibility of T.G.'s identification in the way Mr. Short suggests. The conversations T.G. testified about overhearing could have occurred using different phones, restricted caller ID, different SIM cards, or phone numbers associated with people other than D.M., T.G., or Mr. Short. And, notably, T.G. did not purport to know the method D.M. used to converse with Mr. Short. Furthermore, Mr. Short does not cite any legal authority or to the parts of the record he believes support his contention that "[t]he lack of cell phone evidence affects the credibility of [T.G.'s] testimony that Mr. Short was the shooter," as required by App.R. 16(A)(7). (*See* Brief of Appellant at 22.) For these reasons, his argument is not well-taken.

{¶ 29} In a similar vein, Mr. Short also takes issue with the state's failure to present any other eyewitness testimony linking Mr. Short to the scene of the May 28th shooting. He speculates that additional eyewitnesses must have existed because "[t]he responding officer's body camera recording shows that other persons were present during the immediate aftermath of the shootings." (Brief of Appellant at 21.) But, that contention is not compelling because it is purely speculative. It assumes the persons observed on the body camera footage witnessed the shooter at the scene, either knew who the shooter was or were able to see—late at night—features that would be useful in identifying the shooter, and would have been willing to share this information with law enforcement. Setting aside the speculative nature of such evidence, the absence of expected evidence is not compelling when it comes to our evaluation of the manifest weight challenge Mr. Short makes on appeal.

{¶ 30} To cast further doubt on the credibility of T.G.'s identification testimony, Mr. Short points to T.G.'s belated identification of Mr. Short. (Brief of Appellant at 22. *See, e.g.*, Tr. Vol. II at 363-65.) But Mr. Short does not explain why T.G.'s belated identification should lead us to conclude that the jury clearly lost its way when it accepted as true T.G.'s unequivocal and unwavering testimony that Mr. Short shot him and D.M. on May 28th in D.M.'s apartment. To be sure, Mr. Short does not contend the state's evidence was inconsistent in this key respect. As such, Mr. Short's argument as to the import of the belated identification is not well-taken.

{¶ 31} Mr. Short also calls into question the method through which law enforcement was able to correlate T.G.'s identification of "Gator" as the May 28th shooter to Mr. Short.

(*See* Brief of Appellant at 18-19.)  At trial, T.G. confirmed he was familiar with Mr. Short's visible tattoos prior to May 28, 2020, which he described as "[a] 24 tattoo on his neck, alligator on his face, [and] a spider web going up his arm." (Tr. Vol. II at 346.  *See also* Tr. Vol. II at 378-79.)  On appeal, Mr. Short contends that T.G.'s photo-array identification of Mr. Short as the person he knew as "Gator" was not reliable because no other photographs in the array showed "a person with tattoos on their head." (Brief of Appellant at 18.)  And, we note that Mr. Short is the only person in the photo array with visible face and/or neck tattoos.  (*See* Tr. Vol. II at 378-80; Tr. Vol. III at 487-89; Ex. CC-1.)  This is important because T.G. told detectives that he picked Mr. Short's photograph out of the photo array based on his neck and face tattoos. (Tr. Vol. II at 378-79.  *See also* Tr. Vol. III at 479, 487-88; Ex. CC.)

{¶ 32} One of the blind administrators for the photo array, Detective Christopher Boyle, testified about using a photo identification lineup system to generate the photo array in this case. (Tr. Vol. III at 471-72, 485-86.)  To do this, the blind administrator inputs the physical characteristics of the suspect given to him by the detective working the case. (*See* Tr. Vol. III at 472-73, 476, 483-85.)  Detective Boyle acknowledged that face and neck tattoos are relevant physical attributes of a suspect's face (*see* Tr. Vol. III at 484-85) and agreed that neck and face tattoos had become "more prevalent" over the years (Tr. Vol. III at 491-92).  On that point, Detective Boyle generally explained that, if the preparer of a photo array believes the array generated by the system did not accurately depict enough variation or similarity with the suspect's physical attributes, it would be appropriate to generate additional photo array options. (*See* Tr. Vol. III at 490-91; Tr. Vol. VI at 918.)

{¶ 33} The record before us does not indicate why Mr. Short was the only person with face or neck tattoos in the photo array shown to T.G. because the detective who prepared it—Detective Scott Polgar—did not testify at trial. (*See* Tr. Vol. III at 485-86. *See also* Tr. Vol. VI at 918.)  And, we note that nothing in the record suggests T.G. told police that "Gator" was the person who shot him and D.M. at any point prior to June 24, 2020, when T.G. met with Detective Boyle and identified Mr. Short in the photo array. (*See* Tr. Vol. II at 342-43; Tr. Vol. III at 378-79, 476-80; Tr. Vol. VI at 884-85, 918.)  This is significant because Detective Chapman testified—without explaining how—that law

enforcement had developed Mr. Short as a person of interest in the J.G. homicide *before* the May 28th incident involving D.M. and T.G. even occurred. (Tr. Vol. VI at 872.)

{¶ 34} Based on the foregoing, we do have concerns about the make-up of the photo array presented to T.G. in this case, most predominately, the failure to include other persons with face and/or neck tattoos. And based on our review of the record, several unanswered questions remain. Did the detective working the case tell the blind administrators that face and neck tattoos were key physical attributes of the suspect? Did Detective Polgar input such information into the photo array generation system? Were additional photo arrays generated? And, if so, why did the photo array ultimately shown to T.G. fail to include other people with neck or face tattoos? But we have no occasion to address these concerns because Mr. Short does not challenge the propriety of the photo array used in this case or the trial court's decision to admit such evidence on appeal.

{¶ 35} In any event, potential issues with the photo array have little impact on our analysis of Mr. Short's manifest weight challenge. T.G. repeatedly and unequivocally testified that he and his brother were shot by "Gator" on May 28, 2020. (*See, e.g.*, Tr. Vol. II at 317, 321-24.) T.G. identified Mr. Short in the courtroom as the person he knew as "Gator." (Tr. Vol. II at 316-18.) Further, T.G. described "Gator" as having, among others, an alligator tattoo on his face and a tattoo of the number 24 on his neck when he testified at trial and during his June 2020 meeting with Detective Boyle. (Tr. Vol. II at 346; Tr. Vol. III at 479, 487.) The state presented Mr. Short's November 4, 2020 booking photograph showing Mr. Short's face and neck tattoos at trial. (*See* Tr. Vol. VI at 899-900; Ex. GG-1.) Suffice it to say that the nickname "Gator" is consistent with Mr. Short's tattoo of an alligator on his face.

{¶ 36} Considering the totality of the evidence—including all reasonable inferences and weighing the credibility of T.G.—we therefore conclude it was reasonable for the jury to find that Mr. Short was the person responsible for shooting T.G. and D.M. on May 28, 2020. *See, e.g.*, *State v. Brown*, 10th Dist. No. 07AP-244, 2007-Ohio-6542, ¶ 21 (finding that witness's conflicting testimony regarding the identity of her assailant was an issue of weight and credibility for the jury and did not render the appellant's conviction against the manifest weight of the evidence). T.G. testified he was "[a] hundred percent sure" that Mr. Short was the person he called "Gator" (Tr. Vol. II at 352) and that he was "[a] hundred

percent sure" it was Gator who shot him and D.M. on May 28, 2020 (*see* Tr. Vol. II at 354). And, critically, T.G. testified to seeing Mr. Short's face before the shooting began. (*See* Tr. Vol. II at 321-27.) The jury was free to believe the testimony of T.G. regarding the identity of the person who shot him and his brother. The jury was also in the best position to evaluate the credibility of T.G.'s testimony about Mr. Short's actions on May 28, 2020. And, the jury was likewise free to reject the implication by Mr. Short's trial counsel that T.G. was not a credible witness or otherwise failed to provide truthful testimony.

{¶ 37} After reviewing the evidence in this case, we cannot say that the jury clearly lost its way regarding Mr. Short's identity as the shooter on May 28, 2020 and in finding Mr. Short guilty of Counts Four through Nine. As such, we do not find that Mr. Short's convictions for the aggravated murder of D.M., the attempted murder of T.G., or the aggravated burglary offense are against the manifest weight of the evidence. Accordingly, Mr. Short's second assignment of error is overruled.

### D. First Assignment of Error—April 23, 2020 Shooting of J.G. (Counts One through Three)

{¶ 38} In his first assignment of error, Mr. Short contends that the jury's findings of guilt for the aggravated murder, purposeful murder, and felony murder of J.G.[4] (Counts One through Three) are against the manifest weight of the evidence. All three counts stemmed from the April 23, 2020 shooting of J.G. that occurred while he was seated in a U-Haul parked near Audubon Road and Tulane Road in the North Linden area. (*See* Tr. Vol. II at 264; Tr. Vol. III at 442-44.) Of note, this incident occurred approximately two or three blocks away from D.M.'s Pontiac Street apartment. (Tr. Vol. VI at 889-90. *See also* Ex. X.) Although there were no apparent eyewitnesses to the shooting, home surveillance footage in the neighborhood captured a person walk up to the U-Haul, pull out a handgun, shoot through the U-Haul's passenger window multiple times, and run away in the early morning of April 23rd. (*See* July 25, 2022 Tr. Vol. V at 714-25, 781-87; Ex. V-2; Ex. BB-1.)

{¶ 39} Significantly, no physical evidence presented at trial—DNA evidence, crime scene evidence, or otherwise—connected Mr. Short to the scene where J.G. was shot. (*See, e.g.*, Tr. Vol. VI at 927; Brief of Appellee at 13, 18.) Indeed, CPD firearms forensic scientist

---

[4] For purposes of clarity, we note that J.G. and T.G. do not have the same last name and nothing in the record before us suggests they were related.

Caleb Worley confirmed the shell casings recovered from the April 23rd and May 28th crime scenes were fired from two different guns, neither of which was connected to any guns recovered at the scenes or Mr. Short. (*See* Tr. Vol. V at 820. *See also* Ex. W-3.) Furthermore, no eyewitnesses to the April 23rd shooting—if there even were any—testified at trial. And, the state did not present any evidence suggesting Mr. Short had a motive or reason to harm J.G.

{¶ 40} Instead, the state established Mr. Short's identity as the shooter of J.G. through T.G.'s lay witness opinion testimony identifying Mr. Short as the shooter in video surveillance footage depicting the April 23rd incident and evidence from which the state argued the jury could infer that Mr. Short shot J.G. because he mistook J.G. for someone else. This "mistaken victim" theory was predominately based on T.G.'s testimony that he overheard Mr. Short make statements about his intention to harm A.F. prior to and around the time J.G. was killed.

{¶ 41} On appeal, Mr. Short argues the state failed to meet its burden of persuasion in proving his identity as J.G.'s shooter because no credible identification could be made given the poor quality of the surveillance footage and because T.G. was not a credible witness. (*See* Brief of Appellant at 17-20.) As such, the scope of our review of the first assignment of error is limited to determining whether the jury's verdict identifying Mr. Short as the person who shot J.G. and finding him guilty of Counts One through Three is against the manifest weight of the evidence.

{¶ 42} It is without question that the state's case against Mr. Short for the shooting death of J.G. relied heavily on T.G.'s credibility. Mr. Short argues that T.G.'s credibility was highly questionable because he told the responding officers he did not know who shot him and his brother, which was false (Tr. Vol. II at 351-52, 363-64); he was untruthful in his trial testimony when he denied making certain statements to police in his July 21st interview and denied touching a magazine, as shown by extrinsic impeachment evidence (see Tr. Vol. II at 365, 368-74, 376-77; Tr. Vol. III at 415-18, 422); and he had an obvious bias against Mr. Short both before the May 28th shooting, evidenced by the fact that T.G. and D.M. discussed killing Mr. Short because Mr. Short was bullying D.M. (see Tr. Vol. III at 417-18; Tr. Vol. VI at 877; Tr. Vol. IX at 9-14), and certainly after Mr. Short shot T.G. and his brother. (See Brief of Appellant at 18-22.) And, we generally note certain

inconsistencies between T.G.'s various accounts—both during his sworn trial testimony and his unsworn July 21st interview with police—regarding when and what Mr. Short said about his intention to harm A.F. That said, while these issues with T.G.'s credibility certainly bear on our analysis, we are still obligated to examine the full record before us to determine whether Mr. Short is entitled to a reversal on manifest-weight grounds.

### 1. Video Surveillance Footage Identification Evidence

{¶ 43} At trial, the state presented video footage obtained from home surveillance cameras in the neighborhoods where both the April 23, 2020 and May 28, 2020 shootings occurred. While the footage related to the May 28th incident only depicted the shooter arriving at and leaving D.M.'s apartment, the surveillance cameras in the neighborhood where J.G. was shot captured the shooter walk up to the U-Haul, shoot into the vehicle, and run away.

{¶ 44} The state's primary proof of Mr. Short's identity as the person who shot J.G. was T.G.'s lay person opinion testimony "identif[ying] Rashad Short as the person on the video who killed [J.G.]."[5] (Tr. Vol. VII at 1006. *See also* Tr. Vol. VII at 1008-09.) That opinion was based on T.G.'s impressions about the identity of the person depicted in two video clips—totaling approximately 27 seconds—from surveillance footage of the neighborhood where the April 23rd shooting of J.G. occurred. (*See* Tr. Vol. II at 323, 331-53; Tr. Vol. VI at 877-82.) The relevant video clips were presented at trial as Exhibit V-6 and Exhibit V-7, and as part of Exhibit BB-1 (forensic analysis's excerpt of relevant surveillance footage) and Exhibit V-2 (all surveillance footage obtained from the relevant timeframe).[6]

---

[5] Detective Chapman claimed the police developed Mr. Short as a suspect in the April 2020 shooting of J.G. **prior to** May 28, 2020—when T.G. and D.M. were shot. (Tr. Vol. VI at 872.) But, nothing in the record before us explains how or why Mr. Short was identified as a person of interest at that time or, for that matter, at any point before June 24, 2020—when T.G. was first presented with the photo array lineup to identify the person who shot him and his brother in May 2020.

[6] At trial, there was confusion as to precisely which version of the video footage was shown to T.G. (*See* Tr. Vol. VI at 877-81.) Indeed, days after T.G. testified, the trial prosecutor informed the trial court that prior to and during T.G.'s testimony, all counsel were "under the mistaken impression" about which surveillance videos Detective Chapman showed T.G. (Tr. Vol. VI at 880-81.) After T.G. testified, the trial prosecutor reached out to Detective Chapman for clarification. (Tr. Vol. VI at 881.) The videos Detective Chapman showed T.G. were marked as Exhibit V-6 (10-second clip) and Exhibit V-7 (17-second clip) and played for the jury during trial. (Tr. Vol. VI at 881-85.) They were described as "[v]ery short videos" and a "pair of 10-second excerpts" from Exhibit V-2, the video surveillance footage obtained from cameras in the area which had been

{¶ 45} T.G. testified at trial that he identified Mr. Short as the perpetrator in the surveillance videos depicting the April 23, 2020 shooting of J.G. by "[t]he way he walked and the clothes he had on." (Tr. Vol. II at 345.) Video excerpts of the shooting were shown to T.G. by Detective Chapman during their first meeting on July 21, 2020. (*See* Ex. V-6; Ex. V-7.) At trial, T.G. described the videos he was shown as depicting "Gator walking up to the U-Haul, unloading his clip and killing [J.G.]." (Sic.) (Tr. Vol. II at 345. *See also* Tr. Vol. VI at 877-85.) On review, we note that the first excerpt shows a man walking on a sidewalk around 2:00 a.m. on April 23, 2020. (*See* Ex. V-6. *See also* Ex. BB-1 at 2:32-2:42.) The second excerpt shows the man continue to walk towards a U-Haul parked on the street, stop beside the U-Haul, pull out a firearm, repeatedly shoot into the passenger's side window of the U-Haul, and run away. (*See* Ex. V-7; Ex. BB-1 at 2:47-3:00.) J.G. was seated in the driver's seat of that U-Haul, was struck multiple times, and died from numerous gunshot wound injuries. Of note, only the passenger side of the parked U-Haul is visible in the surveillance footage. Thus, while additional surveillance footage depicts a person—presumably J.G.—walk towards the driver's side of the U-Haul and the lights of the vehicle illuminate less than two minutes before the shooting occurred (Ex. BB-1 at 0:54-1:03), no pertinent observations about J.G. can be made from that footage on review.

{¶ 46} It is undisputed that the videos of the April 23rd shooting "do not show the shooter's face with any clarity." (Brief of Appellee at 15.) It is also undisputed that the home surveillance videos presented in connection with both the April and May shootings were of "poor quality" because they were taken at night. (*See, e.g.*, Tr. Vol. V at 750-51, 766.) As a

---

shown to the jury earlier in the trial. (Tr. Vol. VI at 878, 880. *See* Tr. Vol. II at 346-48, 391; Tr. Vol. V at 714-25.) Detective Chapman claimed he created the two video clips he showed to T.G. (Exhibits V-6 and V-7) by holding his cell phone up to a computer screen playing the surveillance videos and recording portions of the surveillance footage with his phone. (Tr. Vol. VI at 878.) Unlike the black-and-white video footage of Exhibit V-2, some color can be seen in Exhibits V-6 and V-7 due to the officer's reflection in his computer screen. (*See* Tr. Vol. VI at 881-82.) Although both were played for the jury in the courtroom, it is unclear whether Exhibits V-6 and V-7 were ultimately admitted into the record as trial exhibits. Neither party explicitly moved to admit either exhibit at the end of trial. (*See* Tr. Vol. VI at 978-85.) Although the trial prosecutor referred to these two exhibits (among others) the day after most of the trial exhibits were admitted, she did not explicitly move to admit these exhibits and the trial court did not expressly pronounce that they were admitted at that time. (*See* Tr. Vol. VI 1001-03.) And, of note, neither Exhibit V-6 nor Exhibit V-7 is included in the exhibit list worksheet filed after trial. (*See* Sept. 15, 2022 Exhibit List Worksheet/Trial Close-Out Form.) In any event, we note that neither the original surveillance video footage (Exhibit V-2) nor the video footage excerpted therefrom and presented through the testimony of forensic video analyst (Exhibit BB-1) contained any color. (*See* Tr. Vol. V at 714-25, 781-87.) Thus, based on the foregoing and in the absence of any testimony suggesting Exhibits V-6 and V-7 had been enhanced to include color, we presume the clips shown to T.G. were in black-and-white for the purposes of our review.

result, the face of the shooter in either incident cannot be made out in the videos. This is significant because although T.G. described Mr. Short as having distinctive face and neck tattoos (*see, e.g.*, Tr. Vol. II at 347, 379), none are visible in the surveillance footage played for the jury and admitted into evidence.

{¶ 47} On appeal, Mr. Short argues the video surveillance footage from the April 23rd shooting does not contain sufficient detail to make a credible identification on these physical attributes alone. (See Brief of Appellant at 18.) Based on our review of those videos, we agree, for the following reasons.

{¶ 48} A lay witness is permitted to give an opinion identifying a person by distinctive characteristics and the like, but such identification must be "taken in conjunction with circumstances." Evid.R. 901(B)(4). Ohio courts have found that a state's case based, in part, on identification from video surveillance footage can survive a manifest weight evidentiary challenge. *See, e.g.*, *Fabal,* 2021-Ohio-1793 at ¶ 29-43 (finding convictions based entirely on circumstantial evidence were not against the manifest weight of the evidence where two persons who reviewed video surveillance footage said defendant "looked like" the perpetrator in the video, defendant's fingerprints were found on the hood of the car involved in the offense, and "[a] sandal of the type often worn by [the defendant] was found near the accident scene"); *State v. Reading*, 3d Dist. No. 07-CA-83, 2008-Ohio-2748, ¶ 23-26 (reasoning that identification from two persons based on their knowledge of the defendant's appearance was enough to support the conviction and was not against the manifest weight of the evidence despite the fact that those persons did not personally see the defendant commit the crime); *State v. Smith*, 8th Dist. No. 92561, 2009-Ohio-5010 (finding video evidence of defendant stealing pharmaceutical totes was enough to convict defendant of crime and was not against the manifest weight of the evidence). At the same time, identity of the perpetrator is an essential element that must be proved beyond a reasonable doubt. *See, e.g.*, *Fabal* at ¶ 26.

{¶ 49} The state posits that T.G.'s testimony claiming to recognize the shooter's gait as being Mr. Short's could suffice as proof beyond a reasonable doubt of Mr. Short's identity as the person who shot J.G. (Brief of Appellee at 15.) To support this contention, the state cites *State v. Norman*, 4th Dist. No. 08CA3059, 2009-Ohio-5458. But that case is distinguishable from the relevant evidence in this case. In *Norman*, the eyewitness's

testimony that the perpetrator had the same "awkward gait" as the defendant was among several other pieces of identification evidence. *Id.* at ¶ 53. And, we note that the eyewitness himself described the gait as "awkward," thus suggesting a particular uniqueness from which a credible identification could reasonably be made. The eyewitness also testified that the assailant had the same build and hair color as the defendant. *Id.* at ¶ 100. But, even more significant in *Norman* was the state's presentation of "DNA evidence link[ing the defendant] to the crime." *Id.* at ¶ 104.

{¶ 50} We also note that the *Norman* court did not meaningfully address the credibility of the victim's identification testimony because "DNA evidence link[ed] [the defendant] to the crime" and the defense "did nothing to discredit either the DNA evidence or the credibility of the [s]tate's witnesses" at trial. *See Norman* at ¶ 104. Indeed, in *Norman,* the defendant was first developed as a suspect by DNA testing of a Halloween mask and tire iron used during the commission of the robbery of a Wendy's shift manager who was making the nightly deposit at a bank. *See id.* at ¶ 2-7. After DNA comparison testing revealed that the defendant's DNA profile matched the only DNA profile developed from the tire iron and one of the DNA profiles on the Halloween mask, law enforcement presented the shift manager with a photo array that included the defendant's photograph. *Id.* at ¶ 8. The shift manager indicated she recognized the defendant as a former Wendy's employee. *Id.* From there, the shift manager indicated she "remembered that [the defendant] had the same build, hair color, and 'awkward gait' as the Assailant." *Id.* Therefore, the state's case was strong even without the victim's testimony about the similarities between the assailant (who was masked) and the defendant.

{¶ 51} On that point, we note that substantive issues regarding the victim's identification testimony about these similarities arose in *Norman* within a limited—and different—context than presented in this case. On appeal, the defendant in *Norman* contended that the trial court erred in allowing the shift manager to testify about the photo lineup by claiming her testimony was irrelevant or unfairly prejudicial. *Id.* at ¶ 50-53. In rejecting the challenge to the relevancy of the shift manager's testimony about the photo lineup, the appellate court noted that the she "testified that her Assailant had the same build, hair color, and 'awkward gait' as [the defendant]," and thus opined that "evidence [the defendant] had many of the same characteristics as the Assailant made it more

probable that [the defendant] was indeed the Assailant." *Id.* at ¶ 53. Suffice it to say, then, that the shift manager's comparison testimony in *Norman* was secondary evidence used to **bolster** the state's already strong identification evidence, while the comparison testimony elicited from T.G. in this case was the principal evidence presented by the state to establish Mr. Short's identity as the person who killed J.G.

{¶ 52} Furthermore, T.G.'s testimony about the similarities between Mr. Short and the preparator depicted in the April 23rd surveillance footage pales in comparison to the shift manager's comparison testimony in *Norman*. Unlike the shift manager in *Norman*, T.G. did not describe Mr. Short's gait as "awkward" or particularly distinctive. Indeed, it is noteworthy that, notwithstanding testimony about Mr. Short having been shot in the right leg some months prior to the shooting of J.G., the shooter's movements do not appear to be hindered or otherwise affected by a leg injury on review of the video surveillance footage from the April shooting incident. (*See* Ex. V-2; Ex. BB-1.) Also significant is that, unlike the shift manager in *Norman*, T.G. did not claim Mr. Short had the same build or hair color as the person depicted on the video surveillance footage from the incident. Indeed, while the shooter's build is visible in the surveillance videos in this case, the hair color is not. And, unlike in *Norman*, no physical evidence—or even circumstantial evidence—was presented at trial connecting Mr. Short to the crime scene (in *Norman*, the defendant's DNA profile was identified on two items used during the crime and recovered from the scene) or the victim (in *Norman*, the shift manager recognized the defendant as a former coworker).

{¶ 53} Even presuming the person who shot J.G. had a "distinctive gait," as the state claims, we do not construe *Norman* as holding that a lay witness's belief that a defendant walks similarly to a suspect in a video, alone, constitutes proof beyond a reasonable doubt of identity. *Compare State v. Marcum*, 12th Dist. No. CA2017-05-057, 2018-Ohio-1009, ¶ 57-63 (finding robbery conviction not against the manifest weight of the evidence where multiple witnesses—including defendant's stepdaughter—testified they recognized the defendant in security camera footage by his appearance, gait, and mannerisms); *State v. Harner*, 12th Dist. No. CA2019-05-011, 2020-Ohio-1184, ¶ 22 (finding convictions relating to stolen property observed on defendant's property were not against the manifest weight of the evidence where trooper testified he recognized defendant because defendant's "clothes, gait, height, and weight matched one of the people he had seen running away"

from the residence where stolen property was observed and trooper testified he was the defendant's neighbor and saw him almost daily); *State v. Dillingham*, 12th Dist. No. CA2011-03-043, 2011-Ohio-6348, ¶ 13-18 (finding convictions connected to shooting in a bar were not against the manifest weight of the evidence where defendant admitted to one witness he was at the bar during the time of the shooting and multiple witnesses testified about seeing the defendant moments before the shooting and identified the defendant as the shooter from video surveillance footage based on his similarities to the shooter's facial features, stature, gait, car (similar type, color, and condition), and the shooter's escape route that was a logical route to the defendant's home). *See also State v. Wells*, 8th Dist. No. 98388, 2013-Ohio-3722, ¶ 108 (finding that because "many witnesses" testified that the defendant and the shooter in the surveillance video had the same walk, the trial court did not abuse its discretion in allowing the jury to view a video recording of the defendant's "gait and walk to determine if it was distinctive and comparable to the person on the surveillance video" because the defendant's "walk was an important identifying factor in this case").

{¶ 54} We are especially reticent to say a gait-based identification, alone, proved Mr. Short's identity as the person who shot J.G. under the facts and circumstances of this case. The suspect's gait was captured for mere seconds on the "[v]ery short video[]" clips shown to T.G. (Tr. Vol. VI at 877-85.) Critically, too, T.G.'s testimony made clear that his observations of Mr. Short before he reviewed the surveillance videos were limited in time and scope. Though it is true T.G. testified he saw Mr. Short approximately two times per week over the course of a few months (Tr. Vol. II at 319), it is clear all of those encounters were for brief drug transactions within the confines of D.M.'s relatively small apartment (*see, e.g.*, Tr. Vol. II at 318, 321-24, 332, 339-40, 346, 349-52, 395; Tr. Vol. III at 424-25; Tr. Vol. IX at 26; Ex. B-43 to Ex. B-54; Ex. B-76 to B-96). Indeed, T.G. testified he "only knew [Mr. Short] through [his] brother" (Tr. Vol. II at 318) and, more specifically, in the narrow capacity as the person who sold drugs to D.M. (Tr. Vol. II at 316-18, 363; Tr. Vol. IX at 26). On review of the photographs taken inside of D.M.'s apartment and in light of T.G.'s spatially limited encounters with Mr. Short, then, we do not find any evidence in the record before us to suggest T.G. would ever have been in the position to observe Mr. Short walking in a series of strides for any appreciable distance such that he could reliably compare his limited observations of Mr. Short's strides with the strides of the shooter in the

video surveillance footage. Sitting as the thirteenth juror, we cannot say, then, that the surveillance videos from the April shooting of J.G. show the suspect walking with a particularly distinctive or remarkable gait. For these reasons, we conclude the video surveillance footage lacks sufficient detail of the perpetrator's gait from which T.G.—given the limited nature of his observations and the absence of any evidence suggesting a uniqueness to Mr. Short's gait—could credibly identify Mr. Short.

{¶ 55} Similarly, we find that T.G.'s claim he was able to identify Mr. Short in the April 23rd surveillance footage by "the clothes he had on" is not credible. (*See* Tr. Vol. II at 345.) True, T.G. described Mr. Short wearing a green jacket, black pants, red ski mask[7], and shiny sparkly belt during what he believes was the relevant timeframe. (*See* Tr. Vol. II at 334, 345, 388-89. *Compare* Tr. Vol. II at 390-92.) However, because the video surveillance was not in color and of relatively poor quality, the perpetrator's clothing in the video was not meaningfully distinctive so as to make a convincing identification. (*See* Ex. V-2; Ex. BB-1. *See also* Tr. Vol. II at 387-92.) At most, the surveillance footage shows the shooter wearing generic pants, sneakers, and a long-sleeved sweatshirt or jacket with a hood. Thus, even presuming T.G.'s description of Mr. Short's clothing was accurate, that testimony was largely inconsequential. There is no evidence in the record before us to connect the clothing T.G. described Mr. Short wearing to the clothing of the person who shot J.G. As such, we agree with Mr. Short that a credible identification could not be made based on clothing given the facts and circumstances of this case.

{¶ 56} The state also suggests it would be appropriate for us to infer that because T.G. testified he identified Mr. Short in the video footage by "[t]he way he walked and the clothes he had on" (Tr. Vol. II at 345), "[t]he jury could have reasonably concluded that [T.G.] was familiar with [Mr.] Short's body type and * * * knew how the clothes fit on his frame." (Brief of Appellee at 16.) In support of this contention, the state describes its observations of the shooter's body type and clothing fit from the video and argues that, when "[c]ombined with the videos' depiction of the shooter's movements,"—which we

---

[7] During the admission of evidence, the trial court noted that "there was a body cam of [Officer Benjamin Cook] at the U-Haul scene" containing "some reference in there to a description from one officer to another that may have been based on a radio dispatch[]" that the shooter was wearing a red ski mask. (Tr. Vol. VI at 983, referencing Ex. V-3.) But, because "[n]one of those witnesses testified as to the description," the trial court ordered the audio referencing the ski mask be excluded or redacted from Ex. V-3—Officer Cook's body worn camera footage from the April 2020 shooting scene. (Tr. Vol. VI at 983-84. *See also* July 27, 2022 Tr. Vol. VII at 1001-02.) Neither party opposed this ruling.

presume is a reference to the shooter's gait—"the jury could have believed [T.G.'s] identification of [Mr.] Short from the videos." (Brief of Appellee at 16.) We are not persuaded by that suggestion.

{¶ 57} The state first observes that the "videos depict the shooter as having a slender frame." (Brief of Appellee at 16.) But, the record before us does not establish that Mr. Short, too, had a slender frame. Certainly, too, Mr. Short's frame at the time of his July 2022 trial could have significantly changed in the more than two years since the shootings occurred. Moreover, T.G. did not testify about his knowledge of Mr. Short's weight, height, or body type at trial. And, most critically, T.G. did not claim that the shooter's body type played a role in his identification of Mr. Short from the surveillance videos.

{¶ 58} The state next observes that "[t]he shooter is wearing a jacket of a particular length," pants significantly below his waist exposing his underwear, shoes that "are a lighter color compared to the dark-colored pants," and "a hat or cap on his head." (Brief of Appellee at 16.) It suggests the jury could reasonably conclude T.G. "knew how the clothes fit on [Mr. Short's] frame." (Brief of Appellee at 16.) Yet, T.G. only claimed to know the color (not length) of Mr. Short's jacket and the color (not positioning) of his pants. (*See* Tr. Vol. II at 334.) T.G. also did not describe the color of the shoes Mr. Short was wearing shortly before J.G. was shot. While it is true that T.G. recalled seeing Mr. Short wearing a red ski mask around the relevant timeframe (Tr. Vol. II at 334), the state acknowledges that only a type of undeterminable headwear can be observed in the video on the shooter's head.

{¶ 59} We are thus not persuaded by the state's suggestion that T.G.'s assumed familiarity with Mr. Short's body type and fit of his clothing somehow lends credence to T.G.'s identification of Mr. Short in the video when T.G. did not claim that either played a role in making the identification. The first problem is that it requires us to infer that because T.G. had seen Mr. Short in the past—again, in a limited spatial, purpose, and time capacity—T.G. could reliably identify Mr. Short by his body type and the "fit" of his clothing in seconds' long excerpts from the poor quality, black-and-white surveillance videos. (*See* Tr. Vol. VI at 878-80.) But, even if it would be appropriate to make such assumption, the primary issue with the contention advanced by the state is that T.G. ***only*** claimed his identification of Mr. Short as the shooter in the surveillance footage was based on the "way he walked and the clothes he had on." (Tr. Vol. II at 345.) Thus, we find it would be

unreasonable for the trier of fact to conclude that T.G. identified Mr. Short in the video footage from May 28th based on these other aspects of his physical appearance.

{¶ 60} The state also contends that because the jury saw Mr. Short in the courtroom and watched the surveillance videos from both shooting incidents, "the jury could determine for itself whether the videos were sufficiently clear for [T.G.] to identify [Mr.] Short as the shooter." (Brief of Appellee at 17.) In a similar vein, the state suggests that because the jury was also shown the surveillance footage of the neighborhood where the May 2020 shooting occurred, the jury "could have reasonably found that the individual depicted in those videos sufficiently resembled"—"both in physical appearance and in manner of movement"—the individual depicted in the videos from the April 2020 shooting of J.G. (Brief of Appellee at 17.) "[S]uch comparison," the state contends, when combined with T.G.'s unequivocal identification of Mr. Short as the person who shot him and D.M. in May, "would have corroborated [T.G.]'s identification of [Mr.] Short as the person who shot [J.G. in April] as well." (Brief of Appellee at 17.)

{¶ 61} In support of those arguments, the state cites to *State v. Littlejohn*, 8th Dist. No. 101549, 2015-Ohio-875. In that case, the appellate court noted that a jury is capable of "view[ing] the surveillance videos, look[ing] at [the defendant in the courtroom,] and determin[ing] for itself whether [the defendant] was * * * shown in the surveillance videos[.]" *Id.* at ¶ 33. We agree with that general proposition. But, we also find its holding to be only of marginal relevance in this case given the significant differences between the identification evidence presented in *Littlejohn* and that presented at Mr. Short's trial.

{¶ 62} Unlike in this case, DNA evidence and eyewitness testimony also connected the defendant to the crime scene in *Littlejohn*. *See id.* at ¶ 34-36. Specifically, officers on patrol in the early morning observed a man wearing gloves sprint across a gas station parking lot while dragging a garbage can. *Id.* at ¶ 4-5. While one officer pursued the man on foot, he saw the man take off his gloves and throw them to the ground. *Id.* at ¶ 6. Although the officers did not catch the man, they recovered the gloves he discarded. *Id.* at ¶ 6-12. DNA testing ultimately determined the defendant's DNA matched the major DNA contributor from the gloves. *Id.* at ¶ 18-21. The reviewing court relied heavily on the DNA evidence—put into context by the testimony of officers about their observations of the perpetrator—when it overruled the manifest weight challenge in *Littlejohn*. *Id.* at ¶ 34-36,

38-40. *See also State v. Greer*, 6th Dist. No. L-21-1153, 2022-Ohio-3082, ¶ 4-12, 39 (noting that, in addition to identification of the defendant by his girlfriend through surveillance video footage, "the state's evidence reveal[ed] the existence of [the defendant]'s DNA * * * on the surgical gloves recovered by law enforcement following the shooting.") *State v. Eckard*, 3d Dist. No. 9-15-45, 2016-Ohio-5174, ¶ 35-43 (finding that "a rational trier of fact [could] have found beyond a reasonable doubt that [the defendant] was the person who committed the burglary based on the testimony of the State's witnesses, the scientific evidence establishing that [the defendant] was the major contributor to the DNA profile found on the crowbar [recovered from the crime scene], and the surveillance video [showing the perpetrator use the crowbar to pry open the gun safe during the burglary].").

{¶ 63} On review of the video surveillance footage, we disagree with the state's suggestion that the jury could have made a credible comparison between the shooter in the surveillance videos from the two incidents. The surveillance footage from both incidents shows an individual running for a few seconds. (*Compare* Ex. BB-1 at 2:58, *with* Ex. V-1: CD 1, "Backyard" at 6:19 and Ex. V-1: CD 2, "East" at 6:13. *See also* Tr. Vol. VI at 891-92.) But, because of the angle of the cameras, direction and speed of the runners, and the poor quality of the black-and-white nighttime footage, we do not believe it would be reasonable to conclude the individual depicted in the two videos was the same person. If anything, the runner in the April 2020 surveillance footage appears to pick up his knees much higher than the runner in the May 2020 surveillance footage.

{¶ 64} The surveillance footage from both incidents also shows a person walking for a few seconds. (*Compare* Ex. BB-1 at 2:31, *with* Ex. V-1: CD 2, "North" at 1:32, 3:15.) But, only the head and shoulders of the individual can be seen in the May 28th surveillance footage, while the April 23rd surveillance footage depicts the full frame of the individual's body. Suffice it to say, then, that no meaningful comparison as to the gait and body type can be made between these two videos. Additionally, the style of the walks depicted in the two videos is different, which undoubtedly limited the jury's ability to make a meaningful comparison between two clips that are already quite brief. The individual depicted in the April surveillance footage appears to be walking with purpose (indeed, towards the U-Haul), while the individual depicted in the May surveillance footage is pacing back-and-forth.

{¶ 65} Based on the foregoing, we do not believe the poor quality, limited scope, black-and-white nighttime surveillance footage shown to T.G. or the jury at trial contained sufficient detail for T.G. or the jury—and now, on appeal, for us—to make a credible identification. (*See, e.g.*, Tr. Vol. II at 390-92; Tr. Vol. V at 793-800; Tr. Vol. VI at 925-27, 942-43, 985-87.) Furthermore, nothing in the record before us suggests the jury was given the opportunity to observe Mr. Short walk any considerable distance in the courtroom such that it could credibly determine for itself whether Mr. Short's gait was similar to the perpetrator's gait in the April 2020 surveillance video. *Compare Wells*, 2013-Ohio-3722 at ¶ 24, 107-08 (where defendant's "walk was an important identifying factor" and "[t]estimony was given by many witnesses who stated that [the defendant] and the shooter in the surveillance video had the same walk[,]" appellate court found that detective's video recording of defendant walking away with a noticeably distinct limp following a custodial interview "allowed the jury to view [the defendant's] gait and walk to determine if it was distinctive and comparable to the person on the surveillance video").

{¶ 66} Again, it is true that a witness may give an opinion identifying a person by distinctive characteristics and the like, but such identification must be "taken in conjunction with circumstances." Evid.R. 901(B)(4). However, here, the video surveillance footage was not meaningfully distinctive so as to allow for a convincing identification in conjunction with the circumstances. And, we reiterate the absence of any physical evidence connecting Mr. Short to the scene where J.G. was killed.

{¶ 67} For all of these reasons, we therefore find merit in Mr. Short's argument that the surveillance footage lacked discernable detail such that it was not possible for T.G. or the jury to make any credible identification of the shooter in that video recording.

### 2. "Mistaken Victim" Theory as Proof of Identity

{¶ 68} At trial, the state also sought to establish Mr. Short's identity as the person who shot J.G. by positing that Mr. Short confused J.G. for A.F. when he shot into the U-Haul on April 23, 2020.[8] (*See* Tr. Vol. VII at 1018-22.) To accept this theory as support for its findings of guilt, the jury had to believe T.G.'s testimony that Mr. Short expressed an

---

[8] During his July 21, 2020 interview with detectives, T.G. gave a different possible explanation for Mr. Short's motive to kill J.G.: that Mr. Short may have been "killing people to lure out [A.F.]." (Tr. Vol. II at 386. *See also* Tr. Vol. IX at 17.) But, the state did not develop this as a possible motive at trial. Nor does it cite this as a potential motive on appeal.

intention to kill A.F. sometime before April 23, 2020 and find that, for some reason—discussed more below—Mr. Short shot J.G. instead.

{¶ 69} Addressing the state's "mistaken victim" identification theory, Mr. Short contends that the state failed to meet its burden of persuasion in proving his identity as J.G.'s shooter because T.G.'s account of statements he heard Mr. Short make in relation to A.F. was neither credible nor shown by the state to be relevant to J.G.'s homicide. (*See* Brief of Appellant at 17-20.)  As to the issue of T.G.'s credibility, Mr. Short cites to T.G.'s undeniable bias against him and the inconsistencies in T.G.'s varying accounts about his encounters with Mr. Short on which the state's "mistaken victim" theory relies.

{¶ 70}  At the outset, we observe the temporal inference underlying the substance of T.G.'s testimony on which the state's "mistaken victim" theory relies.  Although inconsistent in several respects as to specifics, T.G. generally described hearing Mr. Short express a desire to kill A.F. sometime—if not multiple times—before J.G. was shot on April 23, 2020. (*See, e.g.*, Tr. Vol. II at 340-42, 348-50, 385-86; Tr. Vol. IX at 17-18, 21-26.)  In one version describing such encounter, T.G. recalled Mr. Short coming to D.M.'s apartment, stating that "he was going to kill [A.F.] and that he knew where he was," and leaving the apartment about 30 to 40 minutes before T.G. heard approximately "17 to 18 gunshots" in the neighborhood. (*See* Tr. Vol. II at 349-50.  *See also* Tr. Vol. II at 339.)

{¶ 71}  At the time he heard 17 to 18 gunshots, T.G. admitted he did not know who had fired them.  (Tr. Vol. II at 337.)  Nor did he claim to know at that time whether anyone had been shot and, if so, who that was. (*See* Tr. Vol. II at 331-39.)  Certainly, there was no reason for T.G. to believe before, during, or immediately after hearing the 17 to 18 gunshots that J.G. was the person who had been shot.  Indeed, T.G. did not know J.G., was not present when J.G. was shot, did not call the police after he heard these gunshots, and did not claim to hear Mr. Short mention J.G. before he heard the gunshots. (*See, e.g.*, Tr. Vol. II at 331-39, 386.)  Nor did T.G. testify at trial about hearing Mr. Short explicitly confirm any involvement in J.G.'s death. (*See* Tr. Vol. II at 334.)  And, nothing in the record before us suggests Mr. Short had any animus towards J.G., much less that T.G. was aware of any hostility Mr. Short harbored against J.G.  In other words, the state presented no evidence suggesting Mr. Short had any reason or motive to harm J.G.

{¶ 72}  T.G. explicitly testified that he "wasn't paying attention to the date" on which

he heard the 17 to 18 gunshots. (Tr. Vol. III at 419-20.) And, he was not asked to describe the month, weather, or other temporal aspects of that night. The absence of such testimony is significant in light of the testimony from law enforcement officers repeatedly emphasizing the "high crime" and frequent shootings associated with the North Linden neighborhood where the incident occurred. (*See*, *e.g.*, Tr. Vol. II at 264-67, 288-89; Tr. Vol. III at 441-43, 451-52.) Thus, hearing multiple gunshots one evening is not, unfortunately, such an anomaly for the neighborhood that it would be reasonable to find that the night T.G. heard 17 to 18 gunshots was, as a matter of uncontroverted fact, the same night J.G. was shot and killed.

{¶ 73} As such, T.G.'s testimony that Mr. Short expressed an intention to kill A.F. shortly before the shooting of J.G. was based on the inference that the night T.G. heard 17 to 18 gunshots was the same night J.G. was killed. Even presuming that inference to be true, it was J.G.—not A.F.—who was shot that night. True, evidence in the record establishing that J.G. was shot about two or three blocks away from D.M.'s Pontiac Street apartment (Tr. Vol. VI at 889-90; Ex. X) and sustained "approximately 14" gunshot wounds (Ex. H) suggests this inference could be reasonable.[9] But, because it was J.G.—not A.F.— who was shot that night, the state also needed to convince the jury why it should find Mr. Short was the person responsible for J.G.'s death. To bridge that gap, the state theorized at trial that Mr. Short confused J.G. for A.F. when he shot into the U-Haul on April 23, 2020. And, on appeal, the state contends it met its burden of persuasion in proving Mr. Short's identity as J.G.'s killer because "[t]he jury could have believed [T.G.'s] testimony that shortly before the shooting [of J.G.,] [Mr.] Short spoke of killing [A.F.]" and "therefore could have accepted the [s]tate's theory that [Mr.] Short killed [J.G.] mistakenly believing he was [A.F.]." (Brief of Appellee at 17-18.).

{¶ 74} At trial, the state did not present direct or actual evidence proving, as a matter of fact, that Mr. Short shot J.G. because he confused him for A.F. And, the state does not argue that it did on appeal. Instead, the state's "mistaken victim" theory of proving Mr. Short's identity as the person who shot J.G. rests on another *inference*: that Mr. Short shot J.G. because he thought he was shooting A.F. In support of that inference, the state cites to

---

[9] Though perhaps a reasonable inference, we note the concerns about T.G.'s credibility we summarized earlier in our analysis of Mr. Short's first assignment of error.

trial evidence that it claims on appeal—just as it argued at trial—established "[A.F.] and [J.G.] were related, looked alike, and were both connected to the U-Haul van." (Brief of Appellee at 17-18. *See also* Tr. Vol. VII at 1018-22.)

{¶ 75} On review, however, we do not find the evidence on which the state's "mistaken victim" theory relies sufficiently proved that these three assertions were even true.

### a. Familial Relation Between J.G. and A.F.

{¶ 76} The state represents J.G.'s familial relation to A.F. as an uncontroverted fact. (Brief of Appellee at 17.) But, the state does not cite in its brief the evidence on which that assertion relies, and, on review, we do not find compelling evidence in the record to support it. At trial, T.G. only testified that he believed, without identifying any basis for such belief, that J.G. was a family member of A.F. (Tr. Vol. II at 337.) Significantly, T.G. also acknowledged he did not know or see J.G. at any point before J.G. was killed. (Tr. Vol. II at 338, 386.) On that point, nothing in the record before us indicates how or why T.G. believed A.F. and J.G. were related. And, in fact, during his July 21, 2020 interview with detectives, T.G. described A.F. and J.G. as friends—not family members. (Tr. Vol. IX at 17, 25-26.) The state did not present any other evidence suggesting a familial connection between the two men. (*Compare* Tr. Vol. VI at 859-61.) And, the two men do not have the same last names such that a familial connection could even arguably be inferred.

{¶ 77} In any event, the state does not explain how a familial connection between A.F. and J.G. supports its theory that Mr. Short mistook A.F. for J.G. It goes without saying that members of a family do not always look alike. Furthermore, no evidence at trial established that A.F. and J.G. were connected to any of the homes—let alone the same home—in the neighborhood where the shooting occurred by virtue of a familial homestead, relatives in the area, or otherwise.

{¶ 78} For these reasons, we find it would be unreasonable for the jury to accept that Mr. Short mistook J.G. for A.F. because T.G. testified that he believed the two men were related. That testimony lacked the necessary foundation, any corroboration, and certainty. But, even more significantly, it is not possible to ascertain from the record why the state believes a familial relation would even be relevant to advancing its theory that Mr. Short shot J.G. because he mistook him for A.F.

### b. Similar Appearance of J.G. and A.F.

{¶ 79} The state also asserts that A.F. and J.G. looked alike. (Brief of Appellee at 17.) But it does not indicate in its brief the parts of the record it believes provide the evidentiary support for that contention. And, on review, we do not find that it sufficiently does. T.G. admitted he did not know what J.G. looked like (*see, e.g.*, Tr. Vol. II at 338) and did not give any physical description of A.F. when he testified. Because A.F. did not testify and no photographs of A.F. were presented at trial, the jury did not have the ability to evaluate whether A.F. and J.G. looked similar enough such that it would be reasonable to infer that Mr. Short confused J.G. for A.F.

{¶ 80} The only evidence presented at trial that supports the state's claim that J.G. and A.F. looked alike, then, was Detective Chapman's testimony that "they're about the same size, same body structure, same color hair." (Tr. Vol. VI at 859.) The coroner's report described J.G. as white, 21 years old, six feet tall, 141 pounds, with black hair and hazel eyes. (Ex. H.) At most, then, Detective Chapman's testimony, if believed, would suggest that A.F. has black hair and is similar to J.G. in size. Even setting aside any concerns we might have about bias or mistake,[10] we do not find these minimal and common physical attributes to be adequately unique or sufficiently specific such that it would be reasonable for us, sitting in the position of a thirteenth juror, to infer that Mr. Short mistook J.G. for A.F. when he shot into the U-Haul. Indeed, two people can be similar in size, hair color, and body structure, but be of completely different ages, races, or otherwise have such notable differences in their appearances that it would be entirely unreasonable to believe one might be confused for the other. And, on that point, we note that nothing in the record before us suggests that A.F. and J.G. were the same race, around the same age, or had been mistaken for each other in the past. For these reasons, we do not find the evidence presented at trial

---

[10] *See, e.g.*, *United States v. Wade*, 388 U.S. 218, 229 (1967) (acknowledging that, in criminal cases, mistaken identification "probably accounts for more miscarriages of justice than any other single factor"); Sandra Guerra Thompson, *Eyewitness Identifications and State Courts as Guardians Against Wrongful Conviction*, 7 OHIO ST. J. CRIM. L. 603, 606, 610 (2010) (noting that "[a] great deal of unreliability is caused by factors inherent to the eyewitnesses[,]" including age, lighting, cross-race bias, the witness's brief observation period, and tendency for witnesses to focus on a weapon if it is brandished, among other things); Margery Malkin Koosed, *The Proposed Innocence Protection Act Won't--Unless it also Curbs Mistaken Eyewitness Identifications*, 63 OHIO ST. L.J. 263 (2002) (calling for legislative measures to assure greater reliability of eyewitness identification testimony in capital cases); Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 AM. CRIM. L. REV. 1271, 1275 (2005) ("Mistaken eyewitness identification has long been recognized as a leading cause of wrongful convictions.").

sufficiently supports the state's claim that A.F. and J.G. looked alike.

### c. A.F.'s "Connection to" the U-Haul in which J.G. was Shot

**{¶ 81}** The final assertion presented by the state to support its "mistaken victim" theory is its contention that both A.F. and J.G. were "connected to the U-Haul van" by evidence presented at trial. (Brief of Appellee at 17-18.) Certainly, J.G.'s connection to the U-Haul is self-evident given that he was found dead in the driver's seat. The critical question before us is whether the state presented sufficient evidence for the jury to connect A.F. to the U-Haul.

**{¶ 82}** On appeal, Mr. Short contends it did not. (Brief of Appellant at 19.) And, notably, the state's brief does not contain any citations to the trial evidence the state believes established A.F.'s connection to the U-Haul. But, on review of the trial transcript, we note that when advancing the "mistaken victim" theory during closing arguments at trial, the trial prosecutor referenced Detective Chapman's testimony about A.F. being linked to that U-Haul through police investigation. (*See* Tr. Vol. VI at 858-61; Tr. Vol. VII at 1018.) As such, we presume the state is relying on this same testimony as support on appeal. Significantly, Detective Chapman's knowledge about law enforcement's investigation into the shooting of J.G. came mostly from the lead detective in J.G.'s homicide investigation, Detective Harry Conley, who did not testify at trial. (*See* Tr. Vol. VI at 856-57, 916-17.) As a result, the trial court only permitted Detective Chapman to testify generally about the information he received from Detective Conley:

> [PROSECUTOR]: Okay. ***For purposes of the investigation***, had the name Rashad Short come up as a person of interest in this matter?
>
> [DET. CHAPMAN]: Yes, Rashad Short's name came relatively early in the investigation.
>
> [PROSECUTOR]: Generally, could you describe how his name came up?
>
> [DET. CHAPMAN]: Yes. The information came from Detective Harry Conley. There was an ongoing dispute between --
>
> [DEFENSE]: Objection.

THE COURT: Sustained. So his name came up. As a result of his name coming up, what did you do? I don't think I'm going to let you get into the details of why it came up.

[DET. CHAPMAN]: *I don't know if I can answer that because it's Harry Conley's case.*

THE COURT: But as a result of information you got, did you do anything?

[DET. CHAPMAN]: I personally did not.

THE COURT: Okay. All right. If you can get it in some other way, that's fine. But right now, that's my ruling [].

[PROSECUTOR]: [] Through the investigation, were [J.G.] and a person by the name of [A.F.] linked to that U-Haul?

[DET. CHAPMAN]: Yes.

\* \* \*

[PROSECUTOR]: And [J.G. and A.F.] had both been linked to that U-Haul?

[DET. CHAPMAN]: Yes.

[DEFENSE]: *Objection to the link to the U-Haul, Your Honor, unless we have some foundation for it.*

THE COURT: I'm not so sure you want to hear the foundation. But okay. I mean, you can lay a foundation, if you can.

[PROSECUTOR]: Through the investigation, did you determine that most of the parties in this whole thing knew each other?

[DET. CHAPMAN]: Yes.

[DEFENSE]: Objection.

THE COURT: Overruled. *If you're offering it for what he did, not the truth of the matter. Is that what you're offering it for?*

[PROSECUTOR]: *I am.*

> THE COURT: All right. So we have a hearsay rule which generally says, folks, you can't testify as to what others said unless they come to court. There's an exception for you to obtain information and based on that information you act on it or you lead the investigation in a certain way. ***You're allowed to consider it for that, not for the truth of the matter.*** In other words, you can't say, well, since he testified to that that way that these parties must have all known each other. You can consider what he did based on that information, if that makes sense. Probably not. But that's what the law is.

(Emphasis added.) (Tr. Vol. VI at 858-61.)

**{¶ 83}** In light of the clearly limited purpose for which the relevant portion of Detective Chapman's testimony was offered, we disagree with the state's contention that such testimony proved, as a matter of fact, A.F.'s connection to the U-Haul (or, for that matter, that A.F., J.G., and Mr. Short knew each other). At trial, the state affirmed it was presenting the testimony at issue to explain law enforcement's investigation progress—not for the truth of the matter asserted. (*See* Tr. Vol. VI at 858-61.) Based on the trial prosecutor's representations regarding the purpose of that testimony, the trial court overruled defense counsel's "[o]bjection to the link to the U-Haul" for lack of foundation but instructed the jury that it could only consider "what [Detective Chapman] did based on [the] information" he received from Detective Conley, "not for the truth of the matter." (Tr. Vol. VI at 860-61.). We must presume the jury followed the trial court's limiting instruction. *State v. McKinney*, 10th Dist. No. 13AP-211, 2013-Ohio-5394, ¶ 15, citing *State v. Shipley*, 10th Dist. No. 12AP-948, 2013-Ohio-4055, ¶ 62. *See also State v. Franklin*, 62 Ohio St.3d 118, 127 (1991), citing *Parker v. Randolph* 442 U.S. 62, 74-75 (1979).

**{¶ 84}** For these reasons, Detective Chapman's testimony that A.F. had been linked to the U-Haul cannot be utilized on appeal for the truth of the matter asserted. In fact, relying on that testimony as evidentiary support for the state's "mistaken victim" theory is particularly problematic here because it requires the improper stacking of inferences. It is well-established in Ohio that "[a]n inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by [the trier of fact]." *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus. Yet, to rely

on Detective Chapman's testimony as evidence that A.F. was connected to the U-Haul in which J.G. was shot, we would need to do just that: the first inference being that Mr. Short *knew* A.F. was connected to the U-Haul, and the second that Mr. Short mistook J.G. for A.F.

{¶ 85} After reviewing the evidence cited by the state as support for the "mistaken victim" theory it argued to the jury in closing at trial (*see* Tr. Vol. VII at 1018-22)—which we assume, in the absence of citations to the record, to be the same evidence on which the state's "mistaken victim" theory relies on appeal (*see* Brief of Appellee at 17-18)—we do not believe, sitting in our role as the thirteenth juror, that such evidence provides the necessary factual support from which the jury could reasonably accept that Mr. Short killed J.G. mistakenly believing he was A.F.

### d. Other Statements Made in T.G.'s July 21, 2020 Interview

{¶ 86} Notwithstanding the above, we recognize, on careful review of the testimony and evidence presented to the jury at trial, that during his July 21, 2020 interview with police, T.G. claimed that, sometime after J.G. was shot, Mr. Short said "[h]e thought [A.F.] was the one that walked out the house and went to the U-Haul truck, but it wasn't [A.F]." (Tr. Vol. IX at 21-22.) Of considerable note, however, T.G.'s testimony under oath at trial did not include any such statement. And, the audio of T.G.'s July 21st interview was not admitted as an exhibit, but rather, played in open court during trial to "assist [the jury] in weighing the credibility of [T.G.], both the consistent statements and the inconsistent statements, to the extent that they aid you in determining what weight to give to his testimony." (Tr. Vol. III at 429.) As such, the jury was instructed to consider the audio-recorded statements for that purpose only—to weigh the credibility of J.G.'s sworn trial testimony—and we presume the jury followed the trial court's limiting instruction. *McKinney* at ¶ 15, citing *Shipley* at ¶ 62. *See also Franklin* at 127, citing *Parker* at 74-75.

{¶ 87} Significantly, the state did not argue at trial and does not contend on appeal that the jury could rely on T.G.'s unsworn statement to police claiming Mr. Short said he mistook J.G. for A.F. as evidence supporting its mistaken victim theory. And, critically, T.G. not only failed to restate this account when he testified under oath at trial, but, in fact, testified in a manner inconsistent therewith. Specifically, T.G. testified at trial that, other than overhearing Mr. Short tell D.M. to "go watch the news," he never heard Mr. Short "say anything else about his involvement with [J.G.]." (Tr. Vol. II at 333-34.) And while we note

the state posits on appeal that "the jury could have interpreted the '[watch] the news' comment as an admission to [J.G.'s] murder" (Brief of Appellee at 18), we do not find this argument compelling given the unresolved vagueness surrounding the statement's implication.  At trial, T.G. claimed he knew what Mr. Short's statement meant; but, he did not explain to the jury precisely what that understanding was.  (Tr. Vol. II at 333-34.) Moreover, T.G. admitted he did not watch the news after Mr. Short made that statement. (Tr. Vol. II at 334.)  Thus, T.G. did not confirm that his belief as to the meaning of Mr. Short's statement was even correct.  Notably, too, T.G. did not indicate when he overheard Mr. Short tell D.M. "to go watch the news," which means the jury had no temporal information to place it into context and arrive at the inference the state suggests can be drawn therefrom.

{¶ 88}  At issue, then, is whether T.G.'s prior unsworn statement to the police claiming he heard Mr. Short say he mistook J.G. for A.F. provides substantive evidence supporting Mr. Short's conviction for the shooting death of J.G.  Significantly, we note that T.G.'s recorded interview was not played at the state's request for purposes of impeaching a witness declared to be hostile, as contemplated by Evid.R. 607(A).  Rather, the recorded interview was played at the defense's request during defense counsel's cross-examination of T.G. to challenge the veracity of T.G.'s trial testimony denying that he made certain statements to the police.  (*See* Tr. Vol. III at 410-13.)  Before any audio was played, the state argued—and the trial court agreed—that rather than playing the relevant segment for the jury and asking T.G. to address his prior denials, the entire recording should be played based on the "rule of completeness."  (Tr. Vol. III at 411.)  And, this is what happened at trial—until it became clear that the content of the recorded interview far exceeded that necessary to show the inconsistency (or consistency) of T.G.'s testimony and was no longer relevant to the jury's analysis of T.G.'s credibility.  (*See* Tr. Vol. III at 427-28.)  Indeed, after sustaining the defense's objection to the continued playing of the July 21st interview, the trial court judge indicated that had he known "all of this stuff was in the tape, [he] might not have allowed it all to be played."  (Tr. Vol. III at 427-28.)  Notably, too, the state did not question T.G. on redirect examination about his July 21st statement to police claiming that he heard Mr. Short say he mistook J.G. for A.F.  And, again, we emphasize that the state did not contend when it presented its "mistaken victim" theory in the trial court—and does not

posit on appeal—that T.G.'s unsworn statement should be viewed as substantive evidence supporting its theory that Mr. Short shot J.G. because he mistook him for A.F.

{¶ 89} Based on the record before us and presuming, as we must, that the jury followed the trial court's limiting instructions regarding the purpose for which it was permitted to consider the portion of T.G.'s July 21, 2020 audio recorded interview played in court, we do not find the state's "mistaken victim" theory reasonably supported by credible evidence.

### 3. Disposition

{¶ 90} Upon our review of the record in our role as the thirteenth juror, we ultimately find that this is the exceptional case in which the jury's finding that Mr. Short shot and killed J.G. is against the manifest weight of the evidence. The state's case rested exclusively on T.G.'s testimony that he recognized Mr. Short's gait and clothing in the surveillance video and his description of potentially inculpatory statements T.G. claimed he heard Mr. Short make prior to J.G.'s death. Nonetheless, after sitting as the thirteenth juror and reviewing the record, we find there are several significant issues with the identification evidence presented, which, when taken together, lead us to conclude the jury clearly lost its way when it found Mr. Short guilty of Counts One through Three.

{¶ 91} It is true that a witness may give an opinion identifying a person by distinctive characteristics and the like, but such identification must be "taken in conjunction with circumstances." Evid.R. 901(B)(4). Here, because the video surveillance was not in color and of relatively poor quality, the perpetrator's clothing in the video was not meaningfully distinctive so as to make a convincing identification. And, T.G.'s testimony made clear that his observations of Mr. Short's gait were spatially limited to D.M.'s apartment, meaning T.G. did not claim he had ever been in a position to observe Mr. Short walk a distance or take a series of strides comparable to the perpetrator seen in the April 23rd surveillance footage. Sitting as the thirteenth juror, we cannot say, on review, that the surveillance videos from the April shooting of J.G. show the suspect walking with a particularly distinctive or remarkable gait.

{¶ 92} Although T.G. and law enforcement may have been convinced—for any number of reasons—that Mr. Short was the person who killed J.G., the determination of guilt in criminal proceedings is not left to police detectives or lay witnesses, but instead is

left initially to the trier of fact, and then reviewed by us as the thirteenth juror on appeal—both of which are confined to the evidence presented at trial. In exercising our duty in that role, we have carefully examined the record and we ultimately find that, under the facts and circumstances of this case, there is a lack of competent, credible evidence from which a trier of fact, applying a reasonable doubt standard, could return a verdict of guilt as to Counts One through Three.

{¶ 93} While not relevant to our substantive analysis, we also note the trial court judge expressed concern about the state's identification evidence as to Counts One, Two, and Three during trial. In denying the defense's motion for a judgment of acquittal under Crim.R. 29(A) at the close of the state's case-in-chief, the trial court judge described the "identification on the video" as "weak" and noted that he "can't see anything on the video" from the April 2020 incident. (Tr. Vol. VI at 942.) However, and appropriately so, the trial court recognized that, in ruling on a Crim.R. 29(A) motion, he was not in the position to "weigh the evidence and say it's impossible for [T.G.] to make that identification knowing the characteristics that he knew of Mr. Short with regard to the U-Haul shooting." (Tr. Vol. VI at 942.) After the defense rested its case and renewed its motion for judgment of acquittal on all counts under Crim.R. 29(B), the trial court judge reserved ruling on Counts One, Two, and Three until after the jury's verdict had been rendered. (*See* Tr. Vol. VI at 985-86.) Significantly, too, the trial court judge sought guidance from counsel on whether "while the jury is out, after the jury comes back * * * if that's the point where I'm allowed to weigh the evidence." (Tr. Vol. VI at 985-86.) After the jury returned its verdict of guilty on all counts, however, it does not appear from our review of the record that the trial court judge ever ruled on Mr. Short's motion for judgment of acquittal under Crim.R. 29(B). (*See* Tr. Vol. VIII at 1137-43.) Nor does it appear that Mr. Short's trial counsel filed a post-verdict motion for acquittal under Crim.R. 29(C) at any point following trial. While Mr. Short does not attribute error to either on appeal and does not raise a sufficiency challenge in his assignments of error, we nonetheless believe the trial court's apparent concerns about the weight of the state's identification evidence as to Counts One, Two, and Three lend credence to our review of the record.

{¶ 94} "We are cognizant that a jury verdict in a criminal case should not be overturned lightly and that the discretionary power to grant a new trial should be exercised

only in exceptional cases." *State v. Weber*, 124 Ohio App.3d 451, 466 (10th Dist.1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). And we do not intend to go so far as to proclaim Mr. Short's innocence. "Rather, the evidence presented by the state in this case is marked by uncertainties and a lack of sufficient probative evidence on crucial factual issues which, based upon our review, leads us to conclude that the verdict in this case was manifestly against the weight of the evidence." *Weber* at 466. We therefore find that the doubt surrounding T.G.'s identification, the poor quality and limited depiction of the individual(s) in the April 23rd and May 28th surveillance videos, and the absence of any physical evidence connecting Mr. Short to the scene where J.G. was shot all lead us to conclude that the jury lost its way and committed a manifest miscarriage of justice when it found beyond a reasonable doubt that Mr. Short committed the offenses alleged in Counts One through Three.

{¶ 95} Accordingly, in weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we conclude that the interests of justice require that we reverse and remand for a new trial on Counts One, Two, and Three. For these reasons, we sustain Mr. Short's first assignment of error.

## IV. CONCLUSION

{¶ 96} Having sustained Mr. Short's first assignment of error but overruled his second assignment of error, we reverse, in part, the judgment of the Franklin County Court of Common Pleas and remand this matter for further proceedings in accordance with law and consistent with this decision.

*Judgment reversed*; *cause remanded.*

MENTEL, P.J. and JAMISON, J., concur.